IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LELAND O. STEVENS and LELAND O. STEVENS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 11 C 2223 |
| INTERACTIVE FINANCIAL ADVISORS, INC. and REDTAIL TECHNOLOGY, INC., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Before the court are the motions to dismiss of defendants Interactive Financial Advisors, Inc. ("IFA") and Redtail Technology, Inc. ("Redtail"). For the reasons explained below, we grant the defendants' motions in part, and deny them in part.

## BACKGROUND

Plaintiff Leland Stevens, a citizen of Virginia, has worked as a financial advisor since 1983. (Am. Compl. ¶¶ 4, 8.)[1] Defendant IFA, an Illinois-based registered investment advisor ("RIA"), "provides investment research and proprietary software for financial planning purposes to investment advisor representatives." (Id. at ¶ 13.) In 2003, Stevens entered into an oral agreement

---

[1] We gave plaintiffs leave to file an amended complaint to clarify Leland Stevens's citizenship. Stevens owns plaintiff Leland O. Stevens, Inc., (Am. Compl. ¶ 5), which is identified as the "Contractor" in the IFA Independent Advisor Representative Agreement (hereinafter, the "IFA Agreement") attached to plaintiffs' response brief. For the sake of convenience, we will simply refer to the plaintiffs as "Stevens" unless otherwise noted.

with IFA to use its "software and management services" to provide financial advice to his clients. (Id. at ¶¶ 14-15; Stevens Aff. ¶¶ 5-6.) The parties executed a written contract in June 2009. (See IFA Agreement, dated June 3, 2009, attached as Ex. C to Pls.' Resp. (IFA).) Stevens, in his capacity as an "investment advisory representative," obtained the clients and received a share of the fees associated with their accounts. (Am. Compl. ¶ 15; see also id. at ¶ 31 (alleging that Stevens "secured, interviewed, and advised" the clients).) IFA provided financial-planning software and "administ[ered]" the client accounts. (Am. Compl. ¶¶ 14-15.) In connection with his advisory business, Stevens also used web-based electronic database software provided by defendant Redtail. (Id. at ¶¶ 9-10.) He "[o]riginally" paid Redtail directly for its services, but starting in approximately 2005 IFA began making payments to Redtail on his behalf pursuant to IFA's own agreement with Redtail. (Id. at ¶¶ 17-18.) IFA then deducted the fee from payments that it owed Stevens. (Id. at ¶ 19.) Stevens uploaded to Redtail's database confidential client information for approximately 600 of his clients. (Id. at ¶ 11.) Stevens alleges that only about one third of those clients actually received IFA services. (Id. at ¶¶ 14, 29.)

In 2008 and 2009, Stevens recommended an investment to several of his clients that he later learned was fraudulent. (Id. at ¶¶ 20-22.) The complaint suggests (but does not explicitly allege)

that this bad investment was the impetus for IFA's decision to terminate its relationship with Stevens on October 19, 2009. (Id. at ¶ 23.) Thereafter, IFA sent a letter to 224 customers that Stevens had generated informing them that: (1) Stevens was no longer associated with IFA; and (2) the company was "reassigning" those customers to other representatives. (Id. at ¶¶ 24-25.) Stevens alleges that he gave IFA confidential information concerning these clients only to utilize IFA's research and planning tools. (Id. at ¶¶ 26-28.) The clients were always his clients, and IFA had no right to reassign or even contact those clients after it terminated its relationship with him. (Id. at ¶ 27.) IFA has told Stevens not to contact those clients who used IFA's services, (id. at ¶ 31), and IFA and Redtail have blocked his access to the electronic database where his clients' information is stored. (Id. at ¶¶ 29-30.)

Stevens has asserted claims for conversion (Count I), violation of the Virginia Uniform Trade Secrets Act (Count II), tortious interference with existing and prospective business relationships (Count III), breach of fiduciary duty (Count IV), and unjust enrichment (Count V). In a separate count (Count VI), Stevens requests a preliminary injunction compelling the defendants "to grant him immediate access to his client confidential information." (Id. at ¶ 81.) The defendants have filed separate motions to dismiss each count of the complaint.

A.  Standard of Review

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 354 (3d ed. 2004). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 556 (2007)). When evaluating a motion to dismiss a complaint, we must accept as true all factual allegations in the complaint. Iqbal, 129 S. Ct. at 1949. However, we need not accept as true its legal conclusions; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

B.  Choice of Law

The parties rely on both Illinois and Virginia authorities. We apply Illinois choice-of-law rules to determine which state's law governs. See Sound of Music Co. v. Minnesota Min. & Mfg. Co., 477 F.3d 910, 915 (7th Cir. 2007). IFA cites the choice-of-law provision in the parties' written contract, which states that

"[t]his agreement shall be governed under the laws of the State of Illinois except to the extent that preemptive federal law and/or regulations may control." (IFA Agreement ¶ 14; see also IFA's Mem. at 4.) Stevens has not articulated any reason why we should not enforce this provision. See Sound of Music, 477 F.3d at 915 ("Illinois courts generally adhere to a contract's choice of law provisions."). But it does not automatically follow that Stevens's tort claims are governed by Illinois law. Instead, we must ask whether: (1) the choice-of-law provision indicates that the parties intended Illinois law to govern non-contract claims; and/or (2) the plaintiff's tort claims are "dependent" upon the contract. See LaSalle Bank Nat'l Assoc v. Paramont Properties, 588 F.Supp.2d 840, 849 (N.D. Ill. 2008). The choice-of-law provision in this case is not broadly worded to capture all disputes "arising out of" the contract. See, e.g., Medline Industries Inc. v. Maersk Medical Ltd., 230 F.Supp.2d 857, 862 (N.D. Ill. 2002) (contract provision stating that the parties' agreement was "subject to English law" did "not reflect a clear intent that the parties' tort claims be governed by English law."). On the other hand, Stevens's tort claims arguably depend upon the contract's existence: the parties' competing claims to the information at issue are based at least in part on the independent-contractor relationship created by the contract. See LaSalle Bank, 588 F.Supp.2d at 850 ("All of the alleged negligent acts . . . are closely related to the parties'

contractual lender-borrower relationship and could not exist without the Note."). That relationship existed long before the parties' written contract, (see Am. Compl. ¶ 14; Stevens Aff. ¶¶ 5-6), a fact that arguably undercuts the basis for applying the contract's choice-of-law provision to Stevens's claims. But Stevens has not made that argument or otherwise objected to IFA's reliance on Illinois law. Indeed, Stevens does not respond at all to IFA's argument that we should dismiss his claim under the Virginia Uniform Trade Secrets Act based on the parties' choice-of-law provision. (See IFA's Mem. at 4.) Accordingly, we will apply Illinois law to Stevens's claims against IFA.

Evidently, there is no choice-of-law provision governing Stevens's relationship with Redtail. (Redtail denies that it has any relationship with Stevens at all.) Both parties rely on Virginia law, and we see no basis to override their implicit agreement. See City of Clinton, Ill. v. Moffitt, 812 F.2d 341, 342 (7th Cir. 1987) ("Litigants can, by stipulation, formal or informal, agree on the substantive law to be applied to their case, within broad limits not exceeded here."). Stevens is a citizen of Virginia, and we infer from the complaint that Virginia is where Stevens is feeling the financial impact of Redtail's alleged torts. Therefore, we will apply Virginia law to Stevens's claims against Redtail. See Harter v. Iowa Grain Co., 220 F.3d 544, 559 n.13 (7th Cir. 2000) (the court will not perform an independent choice-of-law

analysis where the parties agree on the governing law and the choice bears a "reasonable relation" to their dispute).

B. **IFA's Motion to Dismiss**

1. **Whether IFA is Legally Prohibited From Disclosing the Information that Stevens Seeks.**

IFA argues that it cannot disclose nonpublic financial information to Stevens because he is no longer associated with an RIA. The Investment Advisers Act of 1940 requires firms providing financial advice to register with the SEC. See 15 U.S.C. § 80b-3.[2] Stevens has indicated that he has not associated himself with a new RIA since IFA terminated its relationship with him, and he appears to concede that neither he nor his company (Leland O. Stevens, Inc.) is independently registered. At oral argument, IFA cited Regulation S-P as authority for the proposition that Stevens must be authorized to provide investment advice before IFA may disclose nonpublic client information to him. The SEC adopted Regulation S-P pursuant to the financial-privacy provisions of the Gramm-Leach-Bliley Act. See 15 U.S.C. §§ 6801-6809 ("Disclosure of Nonpublic Personal Information"). The regulation requires financial institutions to provide notice to consumers before disclosing their nonpublic personal information to non-affiliated third parties. See 17 C.F.R. § 248.10. The SEC broadly defines "nonpublic personal information," see 17 C.F.R. § 248.3(t), and Stevens seems

---

[2] There are exceptions, see 15 U.S.C. § 80b-3(b), but neither side has argued that they apply in this case.

to concede that some or all of the information that he seeks from IFA and Redtail qualifies. But "non-affiliated third party" is also broadly defined: "any person" who is not an affiliate or a person jointly employed by the financial institution and a non-affiliated company. See 17 C.F.R. § 248.3(s). If a "consumer" receives adequate and timely notice from a financial institution of a non-exempt disclosure and fails to opt out, then the financial institution may disclose information about that consumer to any non-affiliated third party. See 17 C.F.R. § 248.10(a)(1). The regulation does not distinguish between registered and unregistered third parties.[3] We conclude that Stevens's unregistered status does not bar his claims to recover the information stored on Redtail's database.

The parties disagree whether Regulation S-P nevertheless dictates the procedure that IFA must follow before disclosing the requested information. Stevens argues that the proposed disclosure is exempt, IFA argues that it is not. We think this puts the cart before the horse. We must first decide whether Stevens is entitled to the information from IFA and Redtail, which goes to the merits of his lawsuit. Stevens alleges that the clients are his, not IFA's, and that he alone developed the information stored on

---

[3] After the oral argument in this case, we asked IFA to identify the particular section of Regulation S-P that prohibits it from disclosing information to individuals who are not registered under the Investment Advisers Act. (See Minute Order, dated July 20, 2011, DKT # 56.) IFA effectively concedes in its reply brief that there is no such provision, (see IFA's Reply at 1-2), and it has not cited any other authority to support its position that Stevens must be registered to lawfully receive the information that he seeks.

Redtail's database. He further alleges that a substantial portion of those clients — approximately two-thirds — did not utilize any IFA products or services. It is unclear whether the regulation imposes any duty on IFA with respect to this data. See 17 C.F.R. § 248.10(a)(1) (imposing conditions on disclosure of information "about a consumer"); 17 C.F.R. § 248.3(g)(1) (A "consumer" is "an individual who obtains or has obtained a financial product or service from you" — i.e., the registered investment advisor — "that is to be used primarily for personal, family, or household purposes, or that individual's legal representative."). For its part, IFA argues — or at least initially argued[4] — that it owns the client information and has no legal obligation to disclose it to Stevens. (See Defs.' Mem. at 1 (arguing that the information "belongs to IFA"); see also id. at 3 (arguing that IFA permitted Stevens to use its client information to provide investment advice).) If we conclude that Stevens is entitled to the information, we must then decide whether (or to what extent) IFA must comply with Regulation S-P's procedural restrictions before giving it to him. Contrary to IFA's argument, we conclude that Stevens is not required to allege that the clients consent to disclosure in order to state a claim for relief. Under the

---

[4] IFA took the position at oral argument that it does not matter who has the superior interest in the data — it simply cannot disclose the information to Stevens under Regulation S-P. But at other points during the argument, IFA seemed to indicate that Regulation S-P was the only reason for its refusal to turn over the information to Stevens. In other words, if it could disclose the information to Stevens, it would. So, it is somewhat unclear whether IFA is still claiming that it owns the information.

regulation, it is the disclosing party's obligation, not the recipient's, to notify the consumer and give him or her the opportunity to opt out of the disclosure. See 17 C.F.R. 248.10 (a)(1) (directing the disclosing financial institution to provide the opt-out notices). And the consumer's tacit consent is sufficient. See id. (if the notice is adequate and timely, then the consumer's failure to opt out is sufficient to authorize disclosure). Therefore, we see no basis in the regulation to impose a duty on Stevens to obtain the clients' express consent to disclosure before filing suit.

2. **Whether Stevens's Claims are Properly Pled**

IFA separately argues that Stevens has failed to allege facts supporting the elements of the claims he asserts in his complaint.

a. **Conversion**

To ultimately prevail on his claim for conversion, Stevens must show: "(1) his right to the property; (2) that this right includes the absolute, unconditional right to immediate possession of the property; (3) he has demanded possession of the property; and (4) the defendant took control or claimed ownership of the property wrongfully and without authorization." MacNeil Automotive Products, Ltd. v. Cannon Auto. Ltd., 715 F.Supp.2d 786, 796 (N.D. Ill. 2010) (citation and internal quotation marks omitted). IFA argues that Stevens has failed to allege the first three elements, but we think they can be inferred from the complaint's allegations.

Stevens has plausibly alleged the "essence" of the tort: "wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." Horbach v. Kaczmarek, 288 F.3d 969, 978 (7th Cir. 2002) (citing Illinois law) (internal quotation marks omitted). He is not required to formally recite the elements of conversion in order to state a claim. See MacNeil Auto., 715 F.Supp.2d at 796 ("[F]ormulaic recitations of the elements of a cause of action are not necessary, or, for that matter, sufficient, and MacNeil's allegations plausibly suggest that its right to repossession of the sets was absolute and unconditional.") (internal citation omitted). As we discussed earlier, IFA contends that Stevens's right to the information is not "absolute and unconditional." But Stevens is not required to prove his claim at this stage of the case, and we have some doubts about Regulation S-P's application to at least a portion of the information in question. (See supra.) IFA's motion to dismiss Stevens's conversion claim (Count I) is denied.

b. **Trade Secret Misappropriation**

Count II is styled "Violation of Virginia Uniform Trade Secrets Act." IFA contends that Stevens cannot maintain a claim under the Virginia Act in light of the IFA Agreement's choice-of-law provision. (IFA Mem. at 4.) Stevens simply ignores this argument in his response brief. IFA's motion is granted as to Count II. See Nelson v. Napolitano, 657 F.3d 586, 590 (7th Cir.

2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel.").

### c. Tortious Interference

IFA argues that Stevens does not have a valid "expectancy" with respect to his former clients because he is no longer affiliated with IFA or another RIA. (IFA's Mem. at 5-6); see City of Rock Falls v. Chicago Title & Trust Co., 300 N.E.2d 331, 333 (Ill. App. Ct. 1973) ("The elements which establish a prima facie tortious interference are the existence of a valid business relationship (not necessarily evidenced by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted."). In its memorandum, IFA reasonably interpreted the complaint to allege that the value of Stevens's client relationships was in the continued receipt of fees for financial advice. (See, e.g., Am. Compl. ¶ 58.) In which case, Stevens's authority to provide financial advice would be highly relevant to the existence of an expectancy and to damages. But Stevens stated at oral argument that he does not intend to provide financial advice to these clients. Rather, he intends to sell his "book of business" — the client relationships he has built up over

the course of his career — to someone who can provide those services. According to Stevens, this is standard practice in his industry, and he plausibly explained that there is no market for a client list without the detailed information that the defendants are withholding from him. We express no opinion at this time about whether a general intent to sell a book of business is valid expectancy. For our current purposes, it is enough that this allegation does not appear in the complaint. A plaintiff may support his claims by asserting facts outside the complaint, see Reynolds v. CB Sports Bar, Inc., 623 F.3d 1143, 1147 (7th Cir. 2010), but the complaint must still provide the defendant with adequate notice of those claims. See Harrell v. United States, 13 F.3d 232, 236 (7th Cir. 1993) ("If a complaint fails to state a claim even under the liberal requirements of the federal rules, the plaintiff cannot cure the deficiency by inserting the missing allegations in a document that is not either a complaint or an amendment to a complaint."); see also Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir.1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). We conclude that the complaint, as currently drafted, is insufficient to give the defendants adequate notice of the plaintiffs' claim for tortious interference. IFA's motion to dismiss Count III is granted.

    d.    **Breach of Fiduciary Duty and Duty of Loyalty**

Stevens alleges that "[a]s a provider of financial services to Leland Stevens, defendant IFA owed Leland Stevens a duty of loyalty and had a fiduciary duty to him." (Compl. ¶ 65.) Stevens has not cited any legal authorities recognizing a fiduciary duty in this context, nor are we aware of any. Count IV is dismissed.

e. **Unjust Enrichment**

IFA argues that it has not been "unjustly enriched" because "[t]he clients and the client [nonpublic information] belong to IFA, not to Stevens." (IFA's Mem. at 8.) This argument goes to the merits of Stevens's claims. IFA's motion to dismiss Count V is denied.

f. **Preliminary Injunction**

IFA argues that Stevens is not entitled to injunctive relief because he has not stated a substantive claim. (IFA's Mem. at 8-9.) We have concluded otherwise, therefore there is no basis to strike Stevens's prayer for a preliminary injunction. Whether he is entitled to such relief is a question for another time. IFA's motion to dismiss Count VI is denied.

B. **Redtail's Motion to Dismiss**

Stevens has named Redtail as a defendant in his substantive claims for conversion (Count I), tortious interference (Count III), and breach of fiduciary duty (Count IV). Redtail is also named in Count VI (preliminary injunction). We can quickly dispense with the fiduciary-duty claim. In his response brief, Stevens argues

that Redtail owed him a fiduciary duty because he had "direct contact" with Redtail and paid directly or indirectly for its services. (Pls.' Resp. (Redtail) at 5.) He has not cited any authority recognizing a fiduciary duty under these circumstances, and his conclusory allegation that Redtail owed him such a duty is plainly insufficient. (See Compl. ¶ 66 ("As a provider of database services, Redtail owes Leland Stevens a duty of loyalty.").) We discuss his other claims below.

### 1. Conversion

Redtail argues that Stevens's conversion claim is deficient because the tort requires that the defendant "wrongfully" exercise control over the plaintiff's property. See Simmons v. Miller, 544 S.E.2d 666, 679 (Va. 2001) ("A person is liable for conversion for the wrongful exercise or assumption of authority over another's goods, depriving the owner of their possession, or any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights."). Redtail's contract with IFA limits Redtail's authority to disclose client information to third parties:

> [T]he Parties acknowledge that as a result of this Agreement, either party may have access to and receive from the other party non-public personally identifiable financial and/or health information (NPI), as defined in federal and state law, regarding consumers, customers, former customers and/or their beneficiaries. The parties agree to maintain the confidentiality of such NPI <u>and shall not use, disclose, furnish or make accessible such NPI to anyone other than authorized employees and agents of that party as necessary to carry out the party's</u>

<u>obligations under this Agreement</u>. . . . At the request of the party that owns the NPI, or in the absence of such request, upon termination of this Agreement, the other party shall promptly return all NPI which has been provided to it, or dispose of such NPI in a manner agreed upon by the parties unless the party is required to maintain such NPI under federal or state laws or regulations.

(Redtail/IFA Agreement, attached as Ex. A to Redtail's Mem., § 8.)[5] IFA has terminated its relationship with Stevens, therefore he is no longer an "authorized" agent or employee of IFA. In refusing to turn over the information that Stevens has demanded, Redtail argues that it is only doing what its contract with IFA requires. This argument is superficially appealing, but Stevens alleges that the majority of the clients about whom he seeks information did not use IFA's services. (Am. Compl. ¶¶ 11, 80.) He further alleges that he used (and paid for) Redtail's services for a year or more before IFA executed its agreement with Redtail. (<u>Id.</u> at ¶ 10 (alleging that Stevens began using Redtail's software in 2004); ¶ 18 (alleging that in approximately 2005 IFA began paying for Redtail's services on his behalf and deducting the fee from his commissions); <u>see also</u>

---

[5] Redtail attached this document to the motion to dismiss it originally filed in the district court in Virginia. When it later refiled its motion in this court, it failed to attach the agreement. This was plainly an oversight, as Redtail's re-filed memorandum refers to the agreement as Ex. A. (<u>See</u> Redtail's Mem. at 2.) Stevens refers to Redtail's agreement with IFA in his complaint, and it is central to his lawsuit, which is based in part on Redtail's rights and obligations with respect to data that Stevens stored on its database. Therefore, we may consider it without converting Redtail's motion to dismiss into a motion for summary judgment. <u>E.E.O.C. v. Concentra Health Services, Inc.</u>, 496 F.3d 773, 778 (7th Cir. 2007) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.").

Redtail/IFA Agreement at 11 (indicating that IFA executed the agreement on February 11, 2006).) It is unclear at this stage of the case whether Redtail is entitled to withhold from Stevens all of the information that he seeks. Therefore, we deny Redtail's motion to dismiss Count I. In light of our conclusion with respect to Count I, we also deny Redtail's motion to dismiss Stevens's prayer for injunctive relief.

2. **Tortious Interference**

Consistent with our earlier discussion, we conclude that the complaint does not give the defendants adequate notice of Stevens's tortious-interference claim. (See supra.) The claim is also deficient as to Redtail because it fails to allege that Redtail's alleged interference was improper. Under Virginia law, the elements of tortious interference are: "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." Glass v. Glass, 321 S.E.2d 69, 77 (Va. 1984). In addition, to prevail under Virginia law on a claim for tortious interference with a business expectancy the plaintiff must show that the defendant's interference was "improper." Stone Castle Financial, Inc. v. Friedman, Billings, Ramsey & Co., Inc., 191 F.Supp.2d 652,

660 (E.D. Va. 2002) ("When a claim for tortious interference involves a business expectancy, the plaintiff must show that the defendant's actions were improper.") (applying Virginia law) (citation and internal quotation marks omitted). Although Stevens alleges that IFA used his confidential information to solicit his clients, he does not allege that Redtail committed any act that would be deemed "improper" under the law. See Duggin v. Adams, 360 S.E.2d 832, 836-37 (Va. 1997) (improper conduct includes misrepresentation, misuse of confidential information, breach of a fiduciary duty, and unethical conduct). As far as we can tell from the complaint, the parties have a good faith dispute about whether Stevens is entitled to the information he seeks from Redtail without IFA's authorization.

## CONCLUSION

IFA's motion to dismiss [44] is granted in part and denied in part. The motion is granted as to Counts III and IV, which are dismissed without prejudice, and denied as to Counts I, II, V, and VI. Redtail's motion to dismiss [39] is granted in part and denied in part. The motion is granted as to Counts III and IV, which are dismissed without prejudice, and denied as to Counts I and VI. Plaintiffs are given leave to file an amended complaint by March 23, 2012 that cures the deficiencies we have identified with their claims, if they can do so. If plaintiffs choose not to file an amended complaint by that date, we will dismiss Counts III and IV

with prejudice. A status hearing is set for March 28, 2012 at 11:00 a.m.

DATE:   March 2, 2012

ENTER:  _____
        John F. Grady, United States District Judge