11-2223.121-RSK                                        December 17, 2012

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| LELAND O. STEVENS and LELAND O. STEVENS, INC., | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) No. 11 C 2223<br>) |
| INTERACTIVE FINANCIAL ADVISORS, INC. and REDTAIL TECHNOLOGY, INC., | )<br>)<br>) |
| Defendants. | ) |

### MEMORANDUM OPINION

Before the court is the joint motion to dismiss of defendants Interactive Financial Advisors, Inc. ("IFA") and Redtail Technology, Inc. ("Redtail"). For the reasons explained below, we grant the defendants' motion in part and deny it in part.

### BACKGROUND

We will assume that the reader is familiar with our previous opinion in this case. See Stevens v. Interactive Financial Advisors, Inc., No. 11 C 2223, 2012 WL 689265, *1 (N.D. Ill. Mar. 2, 2012). However, it will be helpful to revisit the plaintiffs' allegations as refined and augmented by their second amended complaint. Plaintiff Leland Stevens has worked as a financial advisor since 1983. (Second Am. Compl. ¶ 9.)[1] The Investment

---

[1] Leland Stevens is the 100% owner of plaintiff Leland O. Stevens, Inc. (Second Am. Compl. ¶ 5.) For the sake of convenience, we will refer to the plaintiffs as "Stevens" unless otherwise noted.

Advisers Act of 1940 requires persons providing financial advice to register with the SEC. <u>See</u> 15 U.S.C. § 80b-3. Neither Stevens, nor his company, is independently registered. <u>See</u> <u>Stevens</u>, 2012 WL 689265, *1. Therefore, in order to provide financial advice, Stevens had to associate himself with a company that was itself registered under the Act. Defendant IFA is a registered investment advisor ("RIA") that "provides investment research and proprietary software for financial planning purposes to investment advisor representatives." (<u>Id.</u> at ¶ 18.) In 2003, Stevens entered into an oral contract with IFA to use its software and "management services" for his clients.[2] (<u>Id.</u> at ¶¶ 19-20.) The fees collected from Stevens's clients were divided among IFA ("as the RIA"), Virginia Retirement Specialists, Inc. ("as a managing partner"), and Stevens ("as an investment advisory representative [IAR] and independent contractor"). (<u>Id.</u> at ¶ 32.) But the clients themselves were generated solely through Stevens's efforts. (<u>See id.</u> at ¶¶ 27, 48, 50.) Beginning in 2004, Stevens began uploading nonpublic information concerning his clients to an electronic database provided by defendant Redtail. (<u>Id.</u> at ¶ 11.) For approximately a year, Stevens paid Redtail directly for its services. (<u>Id.</u> at ¶ 34.) Then, in 2005, Stevens began using Redtail's database pursuant to IFA's contract with Redtail. (<u>Id.</u>

---

[2] The complaint somewhat vaguely alleges that IFA's "management services consisted of administration of client accounts." (Second Am. Compl. at ¶ 32.)

- 3 -

at ¶ 35; see also Redtail Software License Agreement, dated Feb. 11, 2006, attached as Ex. B to Defs.' Mem.)  IFA paid Redtail directly, but the fees were deducted from Stevens's share of the client fees.  (Id. at ¶ 36.)

Stevens and IFA did not enter into a written contract until June 3, 2009, approximately six years into their business relationship.  (Id. at ¶ 22; see also IFA Independent Advisor Representative Agreement ("IAR Agreement," attached as Ex. A to Defs.' Mem.).)[3]  The IAR Agreement authorized Stevens, as an "independent contractor," to provide investment advisory services to clients "on behalf of IFA." (See IAR Agreement at 1 (Recitals); see also id. at ¶ 3(f) ("Contractor shall clearly and promptly disclose to its clients that Contractor is a representative of IFA for purposes of providing investment advisory services, and for purposes of effecting transactions in securities.").)  Before executing the agreement, Stevens met with Richard Peterbok, IFA's president.  (Id. at ¶ 24.)  At that meeting Stevens sought and received Peterbok's assurance that Stevens "owned" the client information that he had generated and that the IAR Agreement did not affect his ownership rights.  (Id. at ¶¶ 24-25; see also id. at ¶¶ 28-30.)

---

[3]/  We may consider the IAR Agreement without converting the defendants' motion to dismiss into a motion for summary judgment because the complaint expressly refers to, and relies on, that document. (See Second Am. Compl. ¶¶ 22, 29-30.); see also Minch v. City of Chicago, 486 F.3d 294, 300 n.3 (7th Cir. 2007).

- 4 -

IFA terminated its relationship with Stevens on October 19, 2009, apparently in response to an investment that Stevens had recommended to some of his clients that he later learned was fraudulent. (Id. at ¶¶ 37-40.) Four days later, on October 23, 2009, IFA sent a letter to 224 of Stevens's clients stating that IFA was "reassigning them to other representatives." (Id. at ¶ 42.) In addition, IFA and Redtail blocked Stevens's access to the client information that Stevens had uploaded to Redtail's database, including information concerning approximately 400 of Stevens's clients who had never received any services from IFA. (Id. at ¶¶ 46-47.) Stevens also alleges that IFA interfered with a transaction to sell his "book of business" to an individual named Robert Gardner by: (1) telling Gardner that he could not acquire the book of business from Stevens; and (2) "reassigning" Stevens's clients to other IAR's (including Gardner) without compensating Stevens. (Id. at ¶¶ 54-59.)

**DISCUSSION**

Stevens has asserted claims for conversion (Count I), trade-secret misappropriation (Count II), tortious interference with existing and prospective business relationships (Count III), and unjust enrichment (Count IV). In a separate count (Count V), Stevens requests a preliminary injunction compelling Redtail "to grant him immediate access to his client confidential information."

(Id. at ¶ 138.)  The defendants have jointly moved to dismiss the complaint in its entirety.

**A.   Standard of Review**

The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits.  5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 354 (3d ed. 2004).  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 556 (2007)).  When evaluating a motion to dismiss a complaint, we must accept as true all factual allegations in the complaint.  Iqbal, 129 S. Ct. at 1949.  However, we need not accept as true its legal conclusions; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (citing Twombly, 550 U.S. at 555).

**B.   Conversion (Count I)**

Our prior order denied the defendants' motions to dismiss Stevens's conversion claim.  They have again moved to dismiss this claim, this time taking a different tack.  To ultimately prevail on

- 6 -

his claim for conversion of the information stored on Redtail's database, Stevens must show: "(1) his right to the property; (2) that this right includes the absolute, unconditional right to immediate possession of the property; (3) he has demanded possession of the property; and (4) the defendant took control or claimed ownership of the property wrongfully and without authorization." <u>MacNeil Automotive Products, Ltd. v. Cannon Auto. Ltd.</u>, 715 F.Supp.2d 786, 796 (N.D. Ill. 2010) (citation and internal quotation marks omitted). The defendants now argue that Stevens's conversion claim fails because: (1) Stevens authorized them to maintain the information he seeks, citing IFA's "Compliance Policies & Procedures Manual" ("Compliance Manual"); and (2) IFA is required by law to preserve and maintain that information. (Defs.' Mem. at 6.) The problem with the defendants' first argument is that they continue to ignore Stevens's allegation that a substantial portion of the information he seeks from Redtail's database concerns clients who never purchased any products or services from IFA.[4] By its terms, the Compliance Manual does not appear to govern nonpublic information about those clients. (<u>See</u> Compliance Manual at 68 (limiting disclosure and use of nonpublic information about "the Company's clients").) Moreover, the parties did not execute the IAR Agreement until June 2009, approximately

---

[4] Stevens has repeatedly emphasized this allegation in his pleadings, in briefs filed with the court, and during oral argument. And we relied on it in our prior opinion denying the defendants' motions to dismiss Stevens's conversion claim. <u>See</u> <u>Stevens</u>, 2012 WL 689265, *7.

six years into their business relationship. Stevens alleges that all but two of 224 clients that IFA "reassigned" were generated by Stevens during the period of time governed by the parties' oral agreement. (Second Am. Compl. ¶ 21.) And he further alleges that he received assurances from IFA's president that the IAR Agreement would not affect Stevens's superior right to the client information. (Id. at ¶¶ 24-26.) At this stage of the case, we cannot rule as a matter of law that the IAR Agreement and the Compliance Manual foreclose Stevens's claim for conversion.

The second prong of the defendants' argument also fails. First, the one case that they cite in support of this argument is neither factually nor legally relevant. See Chicago Housing Authority v. J.A. Hannah Inv. Advisory Service, Inc., Civ. No. 95 C 5251, 1996 WL 328033, *5 (N.D. Ill. May 9, 1996). Chicago Housing Authority dealt with a fiduciary's obligations under ERISA. See id. It does not shed any light on Stevens's alleged interest in the information he collected while he was affiliated with IFA. The defendants' citation to the Advisers Act is somewhat more relevant. Section 275.204-2 of the Act imposes certain record-keeping requirements on RIA's like IFA. See 17 CFR § 275.204-2. But it is not clear that this obligation applies to information that Stevens uploaded about clients who did not receive any IFA services. And even as to those clients who did receive such services, it is unclear why IFA's record-keeping obligations would

- 8 -

entitle the defendants to prevent Stevens from possessing the information. Cf. Horbach v. Kaczmarek, 288 F.3d 969, 978 (7th Cir. 2002) ("The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held.") (internal quotation marks omitted). The defendants' motion to dismiss Count I is denied.

**C.    Trade-Secret Misappropriation (Count II)**

Stevens's first amended complaint asserted a claim against IFA, only, for violation of the "Virginia Uniform Trade Secrets Act." IFA moved to dismiss this claim on the ground that the IAR Agreement contains an Illinois choice-of-law provision. Because Stevens did not address this argument, we dismissed his trade-secret claim. See Stevens, 2012 WL 689265, *5; see also Nelson v. Napolitano, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel."). Stevens has now amended his complaint to assert a claim for trade-secret misappropriation against *both* defendants under the Illinois Trade Secrets Act ("ITSA").[5] To prevail on this claim, Stevens must show that "(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation." Parus Holdings, Inc. v. Banner

---

[5]  Redtail, a California corporation based in California, has not argued that it is outside the reach of the Illinois statute.

& Witcoff, Ltd., 585 F.Supp.2d 995, 1005 (N.D. Ill. 2008) (citation and internal quotation marks omitted).  The defendants' motion focuses on the second and third elements.

**1. Misappropriation**

The thrust of Stevens's misappropriation claim is that IFA and Redtail disclosed some of the data that Stevens uploaded to Redtail's database to "other independent contractors" without his consent.  (Second Am. Compl. ¶ 86.)  Under the ITSA, "misappropriation" means:

> (1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) disclosure or use of a trade secret of a person without express or implied consent by another person who:
>
> (A) used improper means to acquire knowledge of the trade secret; or
>
> (B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:
>
>> (I) derived from or through a person who utilized improper means to acquire it;
>>
>> (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>
>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (C) before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

765 ILCS 1065/2 (emphasis added); see also Liebert Corp. v. Mazur, 827 N.E.2d 909, 925 (Ill. App. Ct. 2005) ("Misappropriation can be

shown one of three ways — by improper acquisition, unauthorized disclosure, or unauthorized use."). "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." 765 ILCS 1065/2.

It is a close question whether Stevens has adequately alleged misappropriation. As we read his complaint, Stevens alleges that IFA and Redtail disclosed information concerning the 224 clients who had utilized IFA's products and services, not the approximately 400 who had not. (See Second Am. Compl. at ¶¶ 41-42, 59.) Stevens provided investment advisory services to those clients "on behalf of" IFA, (see IAR Agreement at 1 (Recitals), ¶ 3(f)), and he uploaded nonpublic information about them to a database that he accessed through IFA's contract with Redtail. This arrangement suggests that the clients are IFA's, notwithstanding the fact that Stevens (as the IAR) solicited their business and was their point of contact. If they are IFA's clients, then it follows that IFA was entitled — and maybe obligated (see Defs.' Mem. at 8-9) — to reassign those clients to another representative after terminating Stevens (which logically included disclosing information about those clients to the new IAR).[6] On the other hand, Stevens points

---

[6] IFA contends that the clients execute investment advisory agreements with IFA, not Stevens. (See, e.g., Defs.' Reply at 6.) This would be a telling fact, but the defendants raised it for the first time in their reply brief. See, e.g., Dye v. U.S., 360 F.3d 744, 751 n.7 (7th Cir. 2004) (matters raised for the

out that the contract contains a provision permitting IFA to purchase the IAR's client accounts from the IAR or the IAR's estate. (See IAR Agreement ¶ 5(C); see also "Buy Out Terms," attached as Schedule 2 to the IAR Agreement.) This may indicate that the clients were, as Stevens argues, his clients. In addition, Stevens points out that IFA has stated in other proceedings that the IAR — not IFA — "owns" the client accounts. (See Second Am. Compl. ¶ 28.) Again, we cannot resolve the parties' fundamental disagreement about the nature of their business relationship on the pleadings. With respect to Redtail, Stevens alleges that it was on notice that he claimed ownership of the information stored on the database and at one point acknowledged his right to control access to it. (See id. at ¶¶ 13-16.) Nevertheless, Redtail permitted IFA to access the information and disclose it to other IARs. It may be difficult for Stevens to show that Redtail had a duty to prevent IFA from accessing the data. After all, it licensed its database software to IFA, not Stevens. (See Redtail Software License Agreement, dated Feb. 11, 2006, at ¶ 2(a); but see Second Am. Compl. ¶ 11 (alleging that for a period of time Stevens contracted directly with Redtail to use its database software).) But this issue goes to the merits of Stevens's trade-secret claim, not whether it has been properly

---

first time in a reply brief are waived). And in any event, it concerns matters outside the complaint.

- 12 -

pled.  Although we consider it a close call, we conclude that Stevens has sufficiently pled "misappropriation."

**2. Damages**

The defendants argue that Stevens cannot establish any injury because he agreed that he would not sell client information: "[n]o Associated Person is authorized to sell, on behalf of the Company or otherwise, nonpublic information of the Company's clients." (Compliance Manual at 5.)  First, as we just discussed, Stevens argues that he is seeking information about his clients, not "the Company's clients." This fundamental disagreement underlies all of Stevens's claims, and we think it would be inappropriate to attempt to resolve it in a factual vacuum.  Second, it is unclear at this stage of the case how (or whether) this provision affects the sale of "client accounts."  Stevens argues that such transactions are customary in his industry, and that the accounts and the client information go hand-in-hand.  (See Pls.' Resp. at 1-2; Second Am. Compl. ¶¶ 52-53; see also Buy Out Terms ¶ 4(g) (imposing an exclusivity period during which the IAR agrees not to offer or sell the client accounts to a third party.)  The defendants argue that the client account is distinct from the nonpublic information about the client: the former is transferrable, the latter is not.  (See Defs.' Reply at 4 ("This case involves Stevens' desire to sell non-public customer information, not customer accounts.").)  Based upon the record as it now stands, we cannot say who has the better of

- 13 -

this argument. The defendants' motion to dismiss Count II is denied.

**D.  Tortious Interference (Count III)**

We previously dismissed Stevens's claim for tortious interference against IFA because we concluded that he could not expect to receive fees for providing financial advice when he had no intention of affiliating himself with a new RIA.  See Stevens, 2012 WL 689265, *5; see also City of Rock Falls v. Chicago Title & Trust Co., 300 N.E.2d 331, 333 (Ill. App. Ct. 1973) (requiring the plaintiff to show "the existence of a valid business relationship (not necessarily evidenced by an enforceable contract) or expectancy" to ultimately prevail on a claim for tortious interference).  We indicated, however, that Stevens could potentially state a claim for relief based upon the sale of his "book of business" to an individual who *was* authorized to provide financial advice.  See Stevens, 2012 WL 689265, *5.  Stevens now alleges that he entered into an agreement to sell his book of business to Robert Gardner in exchange for 50% of the gross revenue generated from Stevens's former clients.  (See Second Am. Compl. ¶ 56.)  The sale was not completed because IFA transferred Stevens's book of business to Gardner without any compensation.  (Id. at ¶¶ 57-59.)  In response to this claim, IFA essentially relies on the arguments that it has made with respect to Stevens's trade-secret claim.  (See Def.'s Mem. at 10-11.)  We have already concluded that

- 14 -

those arguments stray too far into the merits of Stevens's claims. The defendants' motion to dismiss Count III is denied as to IFA.

We previously held that Stevens had failed to state a claim against Redtail for tortious interference because he had not alleged that Redtail acted improperly. See Stevens, 2012 WL 689265, *7. We think the allegation that Redtail participated in the misappropriation of Stevens's trade secrets is sufficient to allege improper conduct. (See Second Am. Compl. ¶ 86-87); Duggin v. Adams, 360 S.E.2d 832, 836–37 (Va. 1997) ("Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules."); see also Stevens, 2012 WL 689265, *3 ("Both parties [Redtail and Stevens] rely on Virginia law, and we see no basis to override their implicit agreement."). As we suggested infra, Stevens may face an uphill battle to prove misappropriation, but his allegations are sufficient to move to this claim to the next stage of litigation.

**E.   Unjust Enrichment (Count IV - Against IFA, Only)**

IFA has moved to dismiss Stevens's claim for unjust enrichment because their business relationship was governed by a contract. "When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." Utility Audit, Inc. v. Horace Mann Service Corp., 383 F.3d 683, 688-89 (7th Cir. 2004). "In determining

whether a claim falls outside a contract, the subject matter of the contract governs, not whether the contract contains terms or provisions related to the claim." Id. at 689. Stevens has alleged that IFA's president expressly assured him "that ownership of the client information was outside of the contract." (Second Am. Compl. 24.) The parties' written agreement does not expressly deal with this question, and the terms of their oral contract, which was in place for almost their entire business relationship, are unknown at this time. And there is a third contract — IFA's contract with Redtail — that may bear on this question. Moreover, in his complaint and during oral argument Stevens has alluded to relevant industry norms that are largely unexplored at this stage of the case. Therefore, we think it would be "premature" at this time to conclude that Stevens's unjust enrichment claim is barred. See Thycon Const., Inc. v. National Equipment Services, Inc., No. 08 C 824, 2009 WL 723040, *3-4 (N.D. Ill. 2009) (collecting cases). The defendants' motion to dismiss Count IV is denied.

**F.   "Request for Preliminary Injunction"**

As the defendants point out, an injunction is a type of remedy, not a substantive claim. See, e.g., Luis v. Smith Partners & Associates, Ltd., No. 12 C 2922, 2012 WL 5077726, *9 (N.D. Ill. Oct. 18, 2012); cf. Indemnified Capital Investments, SA. v. R.J. O'Brien & Associates, Inc., 12 F.3d 1406, 1413 (7th Cir. 1993) (A claim for punitive damages is a remedy, not an independent cause of

- 16 -

action.). The practice in this district is to dismiss "claims" for injunctive or other equitable relief when pled as separate counts. See, e.g., Luis, 2012 WL 5077726, *9; Obi v. Chase Home Finance, LLC, No. 11 C 3993, 2012 WL 180245, *4 (N.D. Ill. May 15, 2012). On that basis, the defendants' motion to dismiss Count V is granted. We emphasize, however, that this is a technical pleading error that does not impact whether Stevens is ultimately entitled to the injunctive relief he seeks. See Shield Technologies Corp. v. Paradigm Positioning, LLC, No. 11 C 6183, 2012 WL 4120440, *4 (N.D. Ill. Sept. 19, 2012) ("The defendants simply mislabeled a prayer for relief as a separate claim, a technical error that they have corrected by withdrawing Count VIII. Dismissal with prejudice is not warranted.").

## CONCLUSION

The defendants' motion to dismiss [65] is granted in part and denied in part. The motion is granted as to Count V. The motion is otherwise denied. A status hearing is set for January 9, 2013 at 11:00 a.m.

DATE: December 17, 2012

ENTER: _____
John F. Grady, United States District Judge