# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LELAND O. STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 11 C 2223 |
| | ) | |
| INTERACTIVE FINANCIAL | ) | |
| ADVISORS, INC. and REDTAIL | ) | |
| TECHNOLOGY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Leland Stevens has sued Interactive Financial Advisors, Inc. and Redtail Technology, Inc. for conversion, tortious interference with business expectancy, and unjust enrichment under Illinois law.  He also asserts that defendants violated the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/4.  The case is in federal court based on diversity of citizenship.  Defendants have moved for summary judgment on all four of Stevens's claims.  Stevens has cross moved for summary judgment on the conversion and unjust enrichment claims.  Defendants have also separately moved to strike Stevens's expert disclosures.  For the reasons stated below, the Court partly grants and partly denies defendants' motion for summary judgment, denies Stevens's motion for summary judgment, and denies defendants' motion to strike without prejudice.

## Background

Stevens has worked as a financial adviser since 1983, when he was first licensed

to sell insurance by the Commonwealth of Virginia. For a period of time, Stevens only sold insurance products. Eventually, however, Stevens began selling investment advice as well. Because neither Stevens nor his company was registered with the U.S. Securities and Exchange Commission (SEC), he was required to associate with a registered investment adviser (RIA) before doing so. *See* 15 U.S.C. § 80b-3.

Interactive Financial Advisors, Inc. (IFA) is an RIA. In 2003, Stevens entered into an oral agreement with IFA to serve as an independent adviser representative—that is, an independent contractor—for the company. Under this agreement, Stevens was authorized to provide investment advisory services on IFA's behalf. Stevens was also permitted to use IFA's market research, sales material, and proprietary software. Although the fees collected from Stevens's clients were divided between Stevens and IFA, the clients were procured by Stevens alone.

In February 2006, IFA entered into a written agreement with Redtail Technology, Inc. to use Redtail's electronic database services. At some point before February 2006,[1] Stevens began uploading information about his investment clients and insurance clients to a Redtail database.[2] Stevens initially paid Redtail directly for its database services. Later, Redtail was paid by IFA, which then deducted the cost from Stevens's

---

[1] IFA and Redtail had an oral agreement for a period of time before February 2006. The duration of this oral agreement is unclear from the record. Stevens contends that he had an oral agreement with Redtail that predated IFA's oral agreement with Redtail.

[2] Stevens alleges that "[o]f the 650 clients" uploaded to the Redtail database, "426 had insurance products only (not using advisory services offered through IFA) where Leland Stevens was the insurance agent." Pl.'s LR 56.1(a) Stmt. ¶ 10. He asserts, furthermore, that "[o]f the 224 advisory clients" uploaded to the Redtail database, "only 10 were advisory clients with no previous insurance products with Leland Stevens." *Id.* ¶ 13. But as the Court will discuss below, Stevens failed to authenticate the exhibit that supports these facts (he cites to other exhibits as well, but they do not support the facts directly). In any event, this exhibit does not affect the Court's ruling.

share of the client fees.

Stevens and IFA did not enter into a written contract until June 3, 2009, approximately six years into their business relationship. Before executing the contract, Stevens met with Richard Peterbok, IFA's president. Stevens alleges that he received Peterbok's assurance that Stevens "owned" the client information and that the written contract would not affect his ownership rights. Defendants dispute that Peterbok made that statement.

IFA terminated its relationship with Stevens on October 19, 2009. IFA alleges that the reason for the termination was Stevens's involvement in a Ponzi scheme. Four days later, IFA sent a letter to Stevens's investment clients stating that IFA was reassigning them to other independent adviser representatives; IFA assigned the clients to Robert Gardner and Richard Williams. IFA also directed Redtail to block Stevens's access to his database. Redtail complied with this request.

Stevens filed this suit in February 2010. By terminating his access to the Redtail database and reassigning his clients, Stevens alleges, defendants converted his property, misappropriated his trade secrets, tortiously interfered with his business expectancy, and were unjustly enriched.

**Discussion**

Defendants have moved for summary judgment on all four of Stevens's claims: conversion, misappropriation of trade secrets, tortious interference with business expectancy, and unjust enrichment. Stevens has moved for summary judgment on his conversion and unjust enrichment claims. A party is entitled to summary judgment if it shows that there is no genuine issue of material fact and it is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. On cross motions for summary judgment, the court assesses whether each movant has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).

## I.    Authentication

Defendants contend that many of the exhibits attached to Stevens's Local Rule 56.1(a) statement are not properly authenticated and are hearsay. On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). In other words, the Court must determine whether the material can be presented in a form that would be admissible at trial, not whether the material is admissible in its present form.

Defendants argue that Exhibits 5-17, 19-22, 25-26, 32-34, and 49 are not properly authenticated and are hearsay. All of these exhibits, however, are Stevens's business records, and Stevens has sufficiently laid the foundation for them in his affidavit. *See* Fed. R. Evid. 803(6); Pl.'s Reply in Supp. of Mot. for Summ. J., Ex. 2 (Stevens Decl.). As the custodian of the records, Stevens is qualified to authenticate them.

4

Defendants argue that Exhibits 23 and 59 are not properly authenticated and are hearsay. These documents, however, were produced to Stevens by defendants (though one of them is a notice that Stevens sent to IFA and others). *See* Pl.'s Reply in Supp. of Mot. for Summ. J., Ex. 2 (Stevens Decl.), at 2. It is highly likely that Stevens will be able to get this evidence admitted at trial through one of defendants' employees or otherwise.

Defendants argue that Exhibit 4, a purported printout of the Redtail database, is not properly authenticated and is hearsay. Stevens fails to address this exhibit in his affidavit and thus has not authenticated it. That said, Stevens likely would have little trouble getting this exhibit admitted in evidence at trial. As defendants readily admit, the information in Stevens's Redtail database was preserved by Redtail. *See* Defs.' Resp. to Pl.'s LR 56.1(a) Stmt. ¶ 41. Had the exhibit been dispositive, the Court would have provided Stevens an opportunity to submit an additional affidavit to lay the foundation for its admissibility. Because the exhibit is not dispositive, however, the Court will decide the motion without it.

Defendants argue that Exhibit 2, Stevens's insurance license, is not properly authenticated. That exhibit, however, is a copy of a public record that bears a seal appearing to be that of the Commonwealth of Virginia, and a signature appearing to be an attestation by the Commonwealth's commissioner of insurance. Thus, the exhibit is likely self-authenticating. *See* Fed. R. Evid. 902(1).

Defendants argue that Exhibit 44, an exemption certificate from the Commonwealth of Virginia, is not self-authenticating. But although the document bears a seal, it is not signed. Stevens does not offer any other form of authentication. The

Court notes, however, that the exhibit is not dispositive.

Defendants argue that Exhibit 35, a transcript of Joanne Woiteshek's testimony at a Financial Industry Regulatory Authority (FINRA) hearing, is not properly authenticated. Defendants contend that "[t]here is no cover page indicating the forum of the purported proceeding and there is no indication of who the court reporter was." Defs.' Resp. to Pl's. LR 56.1(a) Stmt.¶ 18. Stevens has addressed the authentication objection by providing the entire transcript. *See* Pl.'s Reply in Supp. of Mot. for Summ. J., Ex. 4 (Woiteshek FINRA Test.). Defendants also contend that the testimony is hearsay. However, the testimony is the statement of an opposing party's employee on a matter within the scope of that relationship, and thus is not hearsay. *See* Fed. R. Evid. 801(d)(2)(D).

Defendants argue that Exhibit 40, alleged notes from Stevens's meeting with IFA's president, is not authenticated and is hearsay. Although Stevens's affidavit is sufficient authentication, the notes likely are inadmissible except as a recorded recollection. *See* Fed. R. Evid. 803(5). But because Stevens testified to the same effect in his deposition, the Court may consider the alleged statements by IFA's president that Stevens related during his testimony. Defs.' LR 56.1(a) Stmt., Ex. D (Stevens Dep.), at 152:16-156:17. Those statements are not hearsay. *See* Fed. R. Evid. 801(d)(2)(D).

Finally, defendants argue that Exhibit 36, plaintiff's expert report, is not admissible for two reasons. First, defendants argue that the report is not properly authenticated. Second, defendants have filed a separate motion to strike the expert disclosures. The Court has determined that the outcome of the motions for summary

judgment does not turn on the expert report. Accordingly, the Court does not consider the expert report in ruling on the motions and, consequently, need not resolve these arguments. Defendants' motion to strike is therefore denied without prejudice. Defendants may refile the motion as a motion in limine before trial.[3]

## II.    Conversion claim

The parties have filed cross motions for summary judgment on Stevens's conversion claim. To survive summary judgment, Stevens must point to evidence from which a reasonable jury could find that (1) he has a right to the property, (2) this right includes the absolute and unconditional right to the immediate possession of the property, (3) he made a demand for possession of the property, and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *See Cirrincione v. Johnson*, 184 Ill. 2d 109, 114, 703 N.E.2d 67, 70 (1998). Conversely, to survive summary judgment, defendants must point to evidence tending to show that at least one of these elements is not satisfied.

Stevens asserts that defendants converted two distinct property interests: the Redtail database, which contained confidential information about his investment clients and his insurance clients, and the investment accounts themselves. The Court concludes that no reasonable jury could find that defendants converted the investment client information and investment client accounts. The Court also concludes, however, that a reasonable jury could find that the defendants converted the insurance client information. Accordingly, the Court grants defendants' motion in part and denies it in

---

[3] In his affidavit, Stevens also attempts to authenticate exhibits that are attached to his response to defendants' Local Rule 56.1(a) Statement. Some of these exhibits are offered by defendants as well; others are not dispositive. Accordingly, the Court need not address whether these exhibits are properly authenticated.

part. And because the Court concludes that a reasonable jury could find that defendants did not convert any of Stevens's property interests, the Court denies Stevens's motion for summary judgment in its entirety.

**A.    Investment client accounts**

**1.    Right to the investment client accounts**

Stevens contends that he had a right to the investment client accounts. The contours of the right he claims, however, are less than clear in Stevens's briefs and absent from his complaint. Stevens acknowledges that "the clients themselves maintain unconditional and undisputed control over the funds in the accounts and the information." Pl.'s Mem. in Supp. of Mot. for Summ. J. at 5. Thus, Stevens says, "[o]wnership in this context means the right to have access to confidential information and transfer that information to other parties for the purpose of sale, administration, or service of the clients." *Id.* That would seem to suggest that the right he alleges is a right to the investment client information. But if so, the right to the investment client accounts would be duplicative of Stevens's alleged right "in client confidential information stored on the Redtail database." *Id.* at 3. That may be why Stevens later argues that his right to the investment client accounts also includes "the right to transfer or sell [his] book of business." *Id.* at 9. Similarly, he contends in his reply brief that he "had the right to contact the clients and move them to a different RIA." Pl.'s Reply in Supp. of Mot. for Summ. J. at 8.

It is perhaps clearer what Stevens's claimed right is not. First, Stevens is not claiming a right to continue servicing the investment client accounts following his termination. Indeed, it is undisputed that Stevens was not an RIA and thus that he had

to be associated with an RIA to provide investment advice.  *See* 15 U.S.C. § 80b-3 ("[I]t shall be unlawful for any investment adviser, unless registered under this section, to make use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser.").  Absent such affiliation, Stevens was prohibited from servicing the investment client accounts.  Second, Stevens is not claiming a right to derive revenue from IFA's accounts following his termination.  As defendants note, "[t]here is no allegation that IFA was required to share any of its revenues with Stevens once he left IFA."  Defs.' Resp. to Pl.'s Mot. for Summ. J. at 14.  Stevens does not dispute this assertion in his briefs.[4]  Third, Stevens is not claiming a right to transfer the accounts without the client's approval, likely because investment advisers are required to obtain the client's consent before transferring advisory contracts.  *See* 15 U.S.C. § 80b-5(a)(2) ("No investment adviser . . . shall enter into, extend, or renew any investment advisory contract . . . if such contract . . . fails to provide, in substance, that no assignment of such contract shall be made by the investment adviser without the consent of the other party . . . .); *id.* § 80b-2 (defining "assignment" to include any direct or indirect transfer of an investment advisory contract).  Stevens admits as much in his briefs.  *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 5. (acknowledging that the clients "maintain absolute and undisputed control" over both the account funds and information).

The Court concludes that the right Stevens claims amounts to the right to transfer the investment client accounts upon approval from the clients, as well as the right to

---

[4] Indeed, Stevens's own expert states that Stevens could not "be paid commissions or fees based on transactions within the affected accounts" while he was not affiliated with an RIA.  Pl.'s LR 56.1(a) Smt., Ex. 36 (Conlon Report), at 6.

contact the clients to seek this approval, but nothing more than that. It may be that Stevens thinks there is more to the right. If so, he hasn't made this argument in his briefs. Because Stevens is restricted from servicing and deriving revenue from the accounts, it is difficult to see how he could.

Having determined that the right Stevens claims amounts to a right to transfer the investment client accounts, the Court now turns to whether Stevens did, in fact, have this right. The contract between defendants and Stevens does not expressly state whether Stevens had a right to transfer the investment client accounts. Stevens argues that he did have a right to transfer the investment client accounts under the contract, pointing to three undisputed facts. First, the investment clients were exempt from the noncompete provision in Steven's contract. Pl.'s LR 56.1(a) Stmt., Ex. 39 (Indep. Adviser Rep. Agr.), at 11. Second, his contract included a buyout provision that states, "[d]uring the term of this Agreement, should Contractor or his/her estate wish to sell Contractor's client accounts . . . Company will purchase the IFA/client accounts of Contractor." Pl.'s LR 56.1(a) Stmt., Ex. 39 (Indep. Adviser Rep. Agr.), at 17. Third, in a FINRA arbitration hearing, IFA's chief compliance officer testified that "in our contract, [Stevens] own[ed] the accounts" and "the clients really are [Stevens's] clients" because he could have transferred the accounts to another firm. Pl.'s Reply in Supp. of Summ. J., Ex. 4 (Woiteshek FINRA Testimony), at 75-76. Stevens also contends that IFA's president assured him that the investment clients "belong[ed] to me" and that "[i]t was my business to sell." Defs.' LR 56.1(a) Stmt., Ex. D (Stevens Dep.), at 152:16-156:17.

Defendants, in turn, argue that Stevens did not have a right to transfer these accounts upon termination. They contend that Stevens "conflates IFA's recognition" of

his personal relationships with the investment clients with actual legal relationships. Defs.' Mem. in Supp. of Summ. J. at 4. To "respect" the fact that Stevens procured certain of the clients, defendants say, IFA would not have sought "to legally prohibit Stevens from transferring the IFA [c]lients he serviced to [a] new firm," and, had Stevens retired in good standing, "IFA would have provided [him] a payout." *Id.* But, defendants argue, that does not "change the fact that the clients entered into legal agreements with IFA, not Stevens." *Id.* Defendants assert that their relationship was "[s]imilar to a law firm" in the sense that "clients may be referred to colloquially as belonging to a particular partner and the firm may reward the partner for such relationships," but legally "they are law firm clients, not partner clients." *Id.* at 4-5.

Defendants contend that four undisputed facts support this interpretation of their agreement with Stevens. First, the investment client contracts were between IFA and the clients, not Stevens and the clients. Pl.'s Resp. to Defs.' LR 56.1(a) Stmt. ¶¶ 2-3.[5] Second, the contract between IFA and Stevens states that Stevens "desires to contract with IFA to offer and provide those investment advisory services permitted under the terms of this Agreement *on behalf of IFA . . . .*" Pl.'s LR 56.1(a) Stmt., Ex. 39 (Indep. Adviser Rep. Agr.), at 1 (emphasis added). Third, the contract between IFA and Stevens also states that "all investment decisions are subject to approval by IFA, and may be rejected by IFA in its sole discretion . . . ." *Id.* at 3. Fourth, the investment clients paid IFA directly, and IFA then paid Stevens a portion of the fee. Pl.'s Resp. to

---

[5] Stevens notes that he "personally provided investment advisory services to all the clients and assisted with 100% of the forms needed to open advisory accounts with IFA . . . ." Pl.'s Resp. to Defs.' LR 56.1(a) Stmt. ¶ 3. That does not change the fact that Stevens was not a signatory to the contract between IFA and his investment clients.

Defs.' LR 56.1(a) Stmt. ¶ 8.[6]

Although each party has presented facts that support its respective interpretation of the contract, none of these facts conclusively establish either interpretation. Accordingly, the question of ownership of these accounts does not provide a basis for summary judgment. *See Wilson v. Career Educ. Corp.*, 729 F.3d 665, 687 (7th Cir. 2013) ("It is well established that a party who can show that a contract is ambiguous is entitled to survive summary judgment and to introduce evidence that will resolve the ambiguity.")

### 2. Right that includes the absolute and unconditional right to the immediate possession of the investment client accounts

As discussed above, it is undisputed that Stevens was not an RIA and, therefore, had to associate with an RIA in order to provide financial advice. Accordingly, once Stevens was no longer affiliated with IFA, he was prohibited from servicing the investment client accounts; he could only do so after associating with another RIA. *See* 15 U.S.C. § 80b-3. Stevens's alleged right to the accounts, then, amounts to a right to transfer the accounts upon affiliation with a new RIA.

No reasonable jury could find that Stevens had an absolute and unconditional right to immediate transfer of the investment client accounts, for two reasons. First, it is undisputed that Stevens did not attempt to affiliate with a new RIA. Indeed, in his deposition, Stevens admitted that he "didn't make any attempts to seek an association with another [RIA]." Defs.' LR 56.1(a) Stmt., Ex. D (Stevens Dep.), 228:1-5. He explained that, once an independent adviser representative is under FINRA

---

[6] Stevens notes that his fee was disclosed to clients. That does not change the fact that clients paid IFA directly.

investigation (in Stevens's case, for involvement in a Ponzi scheme), "there is no way an [RIA] is going to take you on board." *Id.* at 227:17-24. Thus, even if Stevens had some right to transfer the accounts, he would have needed to associate with a new RIA for that right to ripen into a right to immediate possession. Because Stevens did not do so, no reasonable jury could find that he held the sort of right necessary to sustain a conversion claim.

Second, when an independent adviser representative moves to a different RIA, the representative must obtain each client's consent before transferring the accounts to his or her new firm. For this reason as well, then, no reasonable jury could find that Stevens held an absolute and unconditional right to immediate possession of the accounts.[7] Indeed, the record suggests that at least some of the clients would have withheld their consent. *See* Defs.' LR 56.1(a) Stmt., Ex. O (Palmer Dep.), at 55:21-56:6 (stating that some of Stevens's former clients informed IFA that Stevens "was contacting them," and that these clients were "very uncomfortable with the situation").

Stevens notes that defendants sent him "cease and desist letters regarding contacting these clients and threatening to sue him for said contact." Pl.'s Mem. in Supp. of Summ. J. at 12; *see also id.* at 6. Though Stevens relies on this for other purposes in his briefs, he could also argue, perhaps, that the letters deterred him from contacting the investment clients and that defendants thereby undermined his ability to obtain the clients' consent and thus deprived him of his right to transfer the accounts.

_____

[7] If Stevens had associated with a new investment firm and obtained his investment clients' consent to transfer their accounts, then he would have had an absolute and unconditional right to immediate possession of the accounts. Had IFA nevertheless refused to transfer the accounts, Stevens would have a viable claim for conversion.

But this argument suffers from the same basic problem as the others: absent affiliation with an RIA, Stevens was prohibited from "mak[ing] use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser." 15 U.S.C. § 80b-5(a)(2). That certainly includes soliciting clients to move to a new RIA.

For the foregoing reasons, defendants are entitled to summary judgment with regard to conversion of the investment client accounts.[8]

### 3.     Issue preclusion

In his reply brief, Stevens notes that an IFA employee testified in a FINRA arbitration hearing that Stevens "owns the advisory client accounts as his book of business and has the right to transfer them as part of his book of business." Pl.'s Reply in Supp. of Mot. for Summ. J. at 2. He alleges, furthermore, that "the issue of ownership of the client accounts was a fact considered by the arbitrator in the FINRA arbitration proceedings leading to a valid and final judgment." *Id.* Thus, he contends, the parties are precluded from litigating the issue in the present suit.

Under the doctrine of issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a

---

[8] Stevens's expert report would not change this analysis. It is undisputed that Stevens would need to affiliate with an RIA before transferring the investment client accounts. Indeed, the expert report states, "in keeping with industry practices [the investment client accounts] should have been available for [Stevens] to . . . transfer to another BrokerDealer *if he associated with one.*" Pl.'s LR 56.1(a) Stmt., Ex. 36 (Conlon Supplemental Report), at 4 (emphasis added); *see also id.*, Ex. 36 (Conlon Report), at 7 ("Theoretically, Mr. Stevens could have associated with a FINRA member firm and continued his business."). Additionally, although the expert report does speak to consent requirements, it does not contradict these requirements either. The report does state, furthermore, that "it is always the clients' right to transfer their account." *Id.*, Ex. 36 (Conlon Report), at 7. That suggests that the client's rights trump the independent adviser representative's.

suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). For the doctrine of issue preclusion to apply, Stevens must show that (1) the issues decided in the prior adjudication are identical to issues presented for adjudication in the current proceeding, (2) there is a final judgment on the merits, (3) defendants actually litigated the issue in the first suit and a decision on the issue was necessary to the judgment, and (4) defendants were a party or in privity with a party in the prior action. *See Gambino v. Koonce*, 757 F.3d 604, 608 (7th Cir. 2014). The Seventh Circuit has held that issue preclusion "usually attach[es] to arbitration awards," albeit "as a matter of contract rather than as a matter of law." *IDS Life Ins. Co. v. Royal Alliance Assocs., Inc.*, 266 F.3d 645, 651 (7th Cir. 2001). When "the arbitrator has failed to explain his findings adequately," however, courts may deny preclusive effect to the arbitration award. *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 361 (7th Cir. 1997).

Issue preclusion does not apply here. First, there is no indication that the issue of ownership was actually litigated in the FINRA arbitration. Stevens relies a comment from one of the witnesses who testified at the arbitration proceeding. The arbitration decision, however, does not mention ownership of the investment client accounts at all. Second, there is no indication that determination of the issue—if it was determined— was essential to the final judgment. Indeed, IFA's third-party claim against Stevens was deemed moot because the arbitrator denied the investment client's claim—one of Stevens's former clients sued IFA over the Ponzi scheme—against IFA in its entirety. Pl.'s Reply in Supp. of Mot. for Summ. J., Ex. 1 (FINRA Arbitration Award), at 8.

## B.    Investment client information

Stevens argues that he also had a right to access the Redtail database, which contained information about the investment clients.  And as discussed in the previous section, Stevens claims that this included "the right to . . . transfer that information to other parties for the purpose of sale, administration, or service of the clients."  Pl.'s Mem. in Supp. of Mot. for Summ. J. at 5.  Defendants argue that "[o]nce IFA terminated its relationship with Stevens after learning of his Ponzi scheme endeavors, IFA legally was prohibited from allowing Stevens to access the Redtail database."  Defs.' Mem. in Supp. of Mot. for Summ. J. at 5.  Specifically, they say that Regulation S-P, an SEC regulation adopted pursuant to the Gramm-Leach-Bliley Act, prohibited IFA from disclosing the information to a nonaffiliated third party, such as a former independent adviser representative.  *Id.* at 6-7.

This argument is dispositive of Stevens's claim.  Regulation S-P provides that RIAs such as IFA "may not, directly or through any affiliate, disclose any nonpublic personal information about a consumer to a nonaffiliated third party unless" the RIA has provided an initial privacy notice, an opt out notice, and a reasonable opportunity for the consumer to opt out of the disclosure.  17 C.F.R. § 248.10.  Stevens does not dispute that his investment clients were consumers and that their information was nonpublic personal information.   Instead, he argues that "Regulation S-P's notice and opt-out requirements do not apply to providing information to owners of the client information."  Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. at 4.  In short, Stevens contends that because he owned the information, he was not a "nonaffiliated third party" under Regulation S-P.

16

Stevens's argument is unavailing. Regulation S-P does not define nonaffiliated third party in terms of ownership. *See In re S.W. Bach & Co.*, 435 B.R. 866, 891 (Bankr. S.D.N.Y. 2010) ("Under Regulation S-P, [t]he departing representative has no property right to a customer's nonpublic personal information and thus, [t]he longstanding dispute about whether the brokerage firm or the registered representative 'owns' the customer relationship is irrelevant." (internal quotation marks omitted)). Rather, Regulation S-P defines a nonaffiliated third party as any person except the RIA's affiliate or a person employed jointly by the RIA and any company that is not the RIA's affiliate. 17 C.F.R. § 248.3(s). An affiliate, in turn, is defined as "any company that controls [the RIA], is controlled by [the RIA], or is under common control with the [RIA] . . . ." *Id.* § 248.3(a). Under this definition, Stevens became a nonaffiliated third party at the moment he was terminated. It is undisputed, moreover, that IFA's privacy policy—which Stevens acknowledged receiving, reading, and understanding in his deposition—instituted a variety of security measures to protect nonpublic personal information, including "discontinuing access of personal information by terminated [independent adviser representatives]." Defs.' LR 56.1(a) Stmt., Ex. Q (2009 IFA Compliance Manual) at 70. Stevens was on notice, then, that IFA would block his access to his Redtail database upon termination of their agreement.

Although the general rule is that nonpublic personal information may not be disclosed to nonaffiliated third parties, Regulation S-P permits disclosure under certain circumstances. Stevens argues that IFA was permitted to disclose the investment client information to him for two reasons. First, Stevens notes that when an RIA provides both an initial notice and an opt-out notice, and the consumer does not opt out despite

being given a reasonable opportunity to do so, the RIA may disclose nonpublic personal information. 17 C.F.R. § 248.10(a)(1). It is undisputed, however, that IFA's privacy policy categorically barred disclosures to nonaffiliated third parties. Accordingly, because IFA did not anticipate disclosing to nonaffiliated third parties, IFA did not "provide the right for its clients to opt out of sharing with nonaffiliated third parties . . . ." Defs.' LR 56.1(a) Stmt., Ex. Q (2009 IFA Compliance Manual), at 68.

Second, Stevens notes that Regulation S-P permits RIAs to "disclose personal information as necessary to effect, administer, or enforce a transaction that a consumer requests or authorizes, or in connection with . . . [p]rocessing or servicing a financial product or service that a consumer requests or authorizes . . . ." 17 C.F.R. § 248.14(a). Stevens suggests that the investment client information falls under this exception. His argument here is undeveloped: he cites the regulation and, in the paragraphs that follow, states that he procured the IFA clients entirely on his own, assisted the IFA clients with filling out IFA paperwork, and signed some of this paperwork. Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. at 5. He also asserts ownership over the clients. *Id.*

It is unclear why, exactly, Stevens thinks that this exception is satisfied. Perhaps he believes that opening an IFA account is the sort of transaction contemplated by the exception. But even if this is so, it is of no help to Stevens. Regulation S-P permits disclosure to persons who are currently affiliated with the RIA, not any person who has ever been affiliated with the RIA. Accordingly, the fact that Stevens was permitted to access information at one point in time does not establish an enduring right to access; rather, his access was circumscribed by his IFA affiliation. Alternatively, perhaps Stevens thinks that these facts demonstrate his ownership over the investment clients'

nonpublic personal information.  As discussed above, however, Regulation S-P does

not define affiliation in terms of ownership; it also does not make an exception for

nonaffiliated third parties who supposedly own the information.

It may be that Stevens has some right to the investment client information.  But

he does not have the sort of right necessary to sustain a claim for conversion.

Regulation S-P precludes Stevens from having a right to the information that includes

the "absolute and unconditional right to the immediate possession of the property."  *See*

*Cirrincione v. Johnson*, 184 Ill. 2d 109, 114, 703 N.E.2d 67, 70 (1998); *see also*

*Horbach v. Kaczmarek*, 288 F.3d 969, 978 (7th Cir. 2002) ("The essence of conversion

is the wrongful deprivation of one who has a right to the immediate possession of the

object unlawfully held.").[9]  Defendants are therefore entitled to summary judgment on

Stevens's conversion claim with regard to the investment client information.

### C.      Insurance client information

The Redtail database also contained information about Stevens's insurance

clients.  It is undisputed that the insurance clients belonged to Stevens alone, that he

was legally permitted to continue servicing these clients following his termination from

IFA, and that Regulation S-P does not apply to these clients.  Defendants nevertheless

contend that Stevens did not have a right to this information because Redtail contracted

with IFA, not Stevens.

The contract between IFA and Stevens does not expressly state whether

Stevens had a right to the insurance client information contained in the Redtail

---

[9] Stevens's expert report would not change this analysis.  Although the expert report
states that Regulation S-P does not apply to insurance clients, it acknowledges that an
independent adviser representative's investment client list is "subject to the restrictions
of . . . SEC Regulation S-P."  Pl.'s LR 56.1(a) Stmt., Ex. 36 (Conlon Report), at 8.

database.  (In fact, the contract does not address the insurance clients at all, as those clients were outside the scope of their agreement.)  Stevens argues that he owned the insurance client information, pointing to two undisputed facts.  First, the Redtail terms of use state that content inputted by the user is the user's property.  Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J., Ex. 14 (Redtail Terms of Use), at 2.  Second, Stevens initially paid Redtail directly (he later paid IFA, who then paid Redtail).  Defs.' LR 56.1(a) Stmt., Ex. K. (Hernandez Dep.), at 44:6-10; *id.*, Ex. L (McLaughlin Dep.), at 20:15-18.  He also alleges that that he had an oral agreement with Redtail that preceded IFA's agreement.  Pl.'s LR 56.1(a) Stmt., Ex. 41 (Peterbok Dep.), at 72:20-22 (acknowledging that Stevens used Redtail before IFA decided to use Redtail).

Defendants point to three undisputed facts to support their interpretation of the agreement.  First, the signed contract was between Redtail and IFA, not Redtail and Stevens.  Defs.' LR 56.1(a) Stmt., Ex. J (IFA-Redtail Contract), at 11.  Second, when Stevens asked Redtail to block access to his database, Redtail sought IFA's permission before doing so.  *Id.*, Ex. K (Hernandez Dep.), at 13:3-18.  Third, the contract between IFA and Stevens did not require Stevens to "commingle" his insurance client information with his investment client information.  *Id.*, Ex. H (IFA-Stevens Contract).

In addition to the facts identified by defendants, two provisions in the terms of use agreement also support defendants' interpretation.  First, the terms of use state that Redtail has "absolute discretion to remove, screen or edit without notice any [u]ser [c]ontent posted or stored on the [s]ite, and we may do this at any time and for any reason.  You are solely responsible for maintaining copies of and replacing any [u]ser [c]ontent you post or store on the [s]ite."  Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ.

J., Ex. 14 (Redtail Terms of Use), at 3.  Second, the terms of use state that "[n]otwithstanding any provision of these [t]erms, Redtail reserves the right, without notice and in its sole discretion . . . [to] block or prevent your future access to and use of all or any portion of the [s]ite or [c]ontent . . . ."  *Id.* at 9.

Although each party has presented facts that support its respective interpretation of the agreement, none of these facts establish either interpretation conclusively.  Accordingly, because the agreement is ambiguous, and there are facts supporting each party's interpretation of the agreement, ownership of the insurance client information does not provide a basis for summary judgment.  *See Wilson*, 729 F.3d at 687.  That is sufficient to deny Stevens's motion for summary judgment.  Defendants argue, however, that Stevens cannot satisfy other elements of conversion.  The Court therefore proceeds to address defendants' other arguments.

First, defendants argue that they were authorized to access the Redtail database and possess the information it contained.  This is irrelevant.  Stevens does not argue that defendants were not authorized to access the database; rather, his claim is based on the fact that he was denied access to the database and the fact that defendants disclosed confidential information in the database to third parties.

Second, defendants argue that Stevens was not deprived of anything because he kept hard copies of the client information.  Although true, Stevens alleges that the electronic database had functionality that was absent from the hard copies of the information.  Defs.' LR 56.1(a) Stmt., Ex. D (Stevens Dep.), at 175:20-176:23.  The electronic database, he adds, "took [ ] years to get . . . into electronic format so I could use it."  *Id.* at 187:14-17.  Additionally, Stevens contends that IFA disclosed the

database to other representatives, thus depriving him of the confidentiality of that information. *See* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 12-13. When Stevens was terminated, defendants granted Robby Gardner, a representative, access to his Redtail database. The database initially contained information on his insurance clients (this information was later deleted, leaving only the investment clients). *See* Pl.'s LR 56.1(a) Stmt., Ex. 55 (Palmer Dep.), at 25:3-26:20. In his deposition, Gardner admitted that he has sold insurance products to Stevens's former clients. *See* Pl.'s LR 56.1(a) Stmt., Ex. 63 (Gardener Dep.), at 57:19-58:4. On these facts, a reasonable jury could find that defendants deprived Stevens of the functionality and confidentiality of the electronic database.

Finally, in their response to Stevens's motion for summary judgment, defendants argue that Stevens did not make a demand for the property. However, Illinois courts recognize an exception to the demand requirement where "the defendant has sold or otherwise disposed of the property," because demand would be futile under such circumstances. *A.T. Kearney, Inc. v. INCA Int'l, Inc.*, 132 Ill. App. 3d 655, 664, 477 N.E.2d 1326, 1334 (1985). Here, defendants disclosed Stevens's confidential information to another independent adviser representative. That is analogous to cases in which the property has been sold or otherwise disposed; in both cases, the defendant is incapable of rectifying the deprivation, rendering demand futile. As another court has explained, "[o]nce confidential information is disclosed, it is no longer confidential." *Trans Union LLC v. Credit Research, Inc.*, No. 00 C 3885, 2001 WL 648953, at *6 (N.D. Ill. June 4, 2001).

For the foregoing reasons, a reasonable jury could find that defendants

converted the insurance client information.  The Court therefore denies defendants'
motion for summary judgment on this aspect of Stevens's conversion claim.

**III.    Trade secrets claim**

Stevens contends that the investment and insurance client information contained
in the Redtail database was a trade secret under the Illinois Trade Secrets Act (ITSA).
By disclosing this information to two other independent adviser representatives, he
argues, defendants misappropriated this trade secret.  Defendants contend that the
information in the Redtail database was not a trade secret; disclosing the information to
another independent adviser representative was not misappropriation; and Stevens did
not incur any damages.

**A.    Trade secret**

Under the ITSA, a plaintiff may recover damages for misappropriation of a trade
secret.  765 ILCS 1065/4.  A "trade secret" is defined as information that "is sufficiently
secret to derive economic value, actual or potential, from not being generally known to
other persons who can obtain economic value from its disclosure or use" and "is the
subject of efforts that are reasonable under the circumstances to maintain its secrecy or
confidentiality."  765 ILCS 1065/2(d).  Although these requirements both pertain to the
secrecy of the information, they "emphasize different aspects of secrecy."  *Learning
Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003).   The first
"precludes trade secret protection for information generally known or understood within
an industry even if not to the public at large"; the second "prevents a plaintiff who takes
no affirmative measures to prevent others from using its proprietary information from
obtaining trade secret protection."  *Id.*  Defendants contend that Stevens cannot satisfy

either element.

In evaluating whether information is a trade secret, Illinois courts typically rely on six common law factors: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See id.* at 728. These factors "are not to be applied as a list of requisite elements." *Id.* Moreover, because determining whether a trade secret exists is "not obvious" and "requires an ad hoc evaluation of all the surrounding circumstances," this question is ordinarily "best resolved by a fact finder after full presentation of the evidence from each side." *Id.* at 723 (internal quotation marks omitted). The same goes for whether the measures taken to guard secrecy were reasonable under the circumstances. *See id.* at 725; *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991) ("[O]nly in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment . . .").

### 1. Sufficiently secret

The ITSA says that customer lists may be trade secrets. 765 ILCS 1065/2(d). To determine whether a customer list is a trade secret, Illinois courts ask whether developing the list involved significant investment of time, money, and effort. *Learning Curve Toys*, 342 F.3d at 728-29 (collecting cases). Customer lists that can be easily

reproduced are not sufficiently secret to constitute trade secrets. In *Carbonic Fire Extinguishers, Inc. v. Heath*, for instance, an Illinois appellate court held that a customer list was not sufficiently secret because the information was "readily obtainable from the yellow pages of the telephone directory." *Carbonic Fire Extinguishers, Inc. v. Heath*, 190 Ill. App. 3d 948, 953, 547 N.E.2d 675, 678 (1989). Although the court acknowledged that "a customer list in certain circumstances has been held to constitute a trade secret regardless of the availability of customer's names in a public directory," the plaintiff in *Carbonic Fire* was "engaged in the restaurant-hood-cleaning business, a service commonly utilized by restaurants." *Id.*, 547 N.E.2d at 678. Accordingly, "anyone seeking to compete with plaintiff, including defendant, could very likely encounter plaintiff's customers by simply contacting restaurants through the telephone directory." *Id.*, 547 N.E.2d at 678; *see also Sys. Dev. Servs., Inc. v. Haarmann*, 389 Ill. App. 3d 561, 575, 907 N.E.2d 63, 76 (2009) (holding that customer list of a computer network service company was not a trade secret because "[i]n today's modern world, computers and computer networks are common business tools," so "[l]ocating potential customers is merely a matter of identifying businesses in a particular town, county, or area and looking up their contact information").

Stevens has presented enough evidence for a reasonable jury to find that his client list was sufficiently secret to constitute a trade secret. He contends that he compiled the client information over the course of about twenty-five years, thus expending significant time and effort. Defs.' LR 56.1(a) Stmt., Ex. D (Stevens Dep.), at 20:5-10 (testifying that he began selling insurance in 1983); *id.* at 176:10-12 (testifying that it took years to develop the database of client information). Moreover, Stevens's

client list was composed not of business entities but rather of individuals who used his services to invest their personal finances. Thus, unlike the customer list in *Carbon Fire*, Stevens's clients could not be readily identified from publicly-available sources. Additionally, much of the information contained in the database—such as client social security numbers, birthdays, and investments—was not publicly available.

Defendants contend that Stevens's client information was not sufficiently secret to constitute "a trade secret because all IFA had to do to obtain it was to contact its own clients and obtain the information from them" using the "account applications and due diligence papers." Defs.' Mem. in Supp. of Summ. J. at 11. Defendants miss the point. Although it is true that defendants could recreate the customer list using their internal records, they could not easily identify the clients in the first instance. The most important information at issue in this case—the fact that certain individuals desired financial services—was not publicly available;[10] rather, it was created through Stevens's considerable efforts over about twenty-five years. Additionally, this argument does not apply to Stevens's insurance clients, who did not have account applications and due diligence papers on file with IFA.

Defendants also argue that client information "could not belong to Stevens." *Id.* at 11. For the reasons stated in the previous section, however, a reasonable jury could find that Stevens did, in fact, have a right to the information.

### 2. Efforts to maintain secrecy

Stevens has also presented enough evidence for a reasonable jury to find that the measures he took to protect the client list were reasonable. "Whether the measures

---

[10] Indeed, as defendants stress elsewhere, the information was nonpublic personal information subject to Regulation S-P.

taken by a trade secret owner are sufficient to satisfy the [ ] reasonableness standard ordinarily is a question of fact for the jury." *Learning Curve Toys*, 342 F.3d at 725. Moreover, "the expectations for ensuring secrecy are different for small companies than for large companies." *Id.* at 724. Here, the expectations for secrecy are low: Stevens operated a sole proprietorship with only one employee. To protect his trade secret, Stevens stored his client list on a password-protected database. And, when he suspected that another representative was attempting to capture certain of his clients, he directed defendants to block access to the database by changing the username and password. Defs.' LR 56.1(a) Stmt., Ex. D (Stevens Dep.), at 128:6-129:21. Given the small size of Stevens's company, a reasonable jury could find that his efforts to maintain secrecy were reasonable.

Defendants contend that the insurance client information specifically is "not a trade secret because Stevens did nothing to protect it." *Id.* Because "IFA had a right to inspect the Redtail database," defendants explain, the fact that "Stevens uploaded information about non-IFA clients into a database he knew IFA had a right to inspect demonstrates Stevens'[s] lack of effort to protect the information . . . ." *Id.* IFA's compliance officer testified, however, that IFA did not keep the passwords to the Redtail databases and, accordingly, IFA could not "log into Redtail and get information about Leland Stevens'[s] clients that were not being serviced by IFA." Defs.' LR 56.1(a) Stmt., Ex. C (Woiteshek Dep.), at 46:24-48:5. When asked whether IFA has access to clients that are not being serviced by IFA, the compliance officer responded, "Advisors can put [non-IFA] clients into the database. IFA does not identify those clients." *Id.* at 47:20-

24.[11]  Indeed, IFA did not even use Redtail to conduct inspections; information about IFA client accounts was managed by a separate custodian, Trust Company of America, which did not have information about Stevens's insurance clients.  *Id.* at 48:12-19.  For these reasons, a reasonable jury could find that Stevens did not believe that IFA had access to his Redtail database.

Moreover, even if Stevens believed that IFA had access to his Redtail database, a reasonable jury could find that IFA and Stevens had an understanding regarding confidentiality of the information, for two reasons.  *See Von Holdt v. A–1 Tool Corp.*, No. 04 C 04123, 2013 WL 53986, at *4 (N.D. Ill. Jan. 3, 2013) ("Illinois decisions interpreting the Trade Secrets Act suggest . . . that a plaintiff's ability to show that an understanding regarding confidentiality may constitute reasonable security measures under the Act.").  First, the contract between IFA and Stevens provided that authorized IFA employees were permitted "to inspect . . . client files . . . to the extent deemed necessary or appropriate by IFA to properly supervise [Stevens] as required by applicable laws, regulations or rules, or as otherwise deemed appropriate by IFA."  Defs.' LR 56.1(a) Stmt., Ex. H (IFA-Stevens Contract), at 2.  That indicates that IFA's right to the information was for the limited purpose of inspection (and, in particular, to ensure compliance with laws and regulations); it does not suggest that IFA was authorized to disclose Stevens's database to other representatives.  Second, as discussed above, when Stevens directed the defendants to secure his database from other representatives, defendants complied.  That suggests that IFA acknowledged the

---

[11] Because Redtail archives the database information, the compliance officer suggested that IFA could ask Redtail to "run a report" or "run a search" on non-IFA clients, but emphasized that "we don't have [the Redtail] passwords."  Defs.' LR 56.1(a) Stmt., Ex. C (Woiteshek Dep.), at 46:9-23, 48:1-5.

information as confidential.

**B.      Misappropriation**

The ITSA defines misappropriation to include disclosure "of a trade secret of a person without express or implied consent by another person who . . . at the time of disclosure . . . knew or had reason to know that knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  765 ILCS 1065/2(b)(2)(B).  Stevens argues that defendants misappropriated his client list by denying him access to the Redtail database and disclosing the list to Robert Gardner and Richard Williams.  Although defendants concede that both of these events occurred, they contend that this did not constitute misappropriation.

**1.      Insurance client list**

The Court begins with the insurance client list.  It is undisputed that defendants disclosed this list.  Defendants reassigned Stevens's clients to Gardner and Williams, thereby disclosing client information to them.  *See* Pl.'s Resp. to Defs.' LR 56.1(a) Stmt. ¶ 57.  Amanda Palmer, Gardner's assistant, testified that Stevens's insurance clients were included in this disclosure.  Defs.' LR 56.1(a) Stmt., Ex. O (Palmer Dep.), at 25:24-26:9.

The only issue in contention, then, is whether defendants knew or had reason to know that knowledge of Stevens's insurance client list was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.  As discussed above, when Stevens suspected that another representative was attempting to capture his clients, he directed defendants to block all access to the Redtail database. Defendants complied with this request.  Additionally, the contract between Stevens and

IFA stated only that IFA was authorized to inspect his client information; it did not state that IFA was authorized to disclose his client information to other representatives. On these facts, a reasonable jury could find that defendants knew or had reason to know that they had a duty to maintain the secrecy of the Redtail database and, accordingly, that defendants misappropriated Stevens's insurance client list.

Defendants contend that "[i]f [i]nsurance [c]lients also had information in the database, it was the result of Stevens'[s] intentional effort to put the information in the database and provide it to IFA," who "had the right to examine the database because it contained IFA [c]lient information." *Id.* at 12. For this reason, defendants argue that they did not acquire the information by improper means. That's not the basis for Stevens's claim, however. Rather, he contends that defendants misappropriated his insurance client list by denying him access to the database and disclosing the database to other representatives. Although misappropriation can be based on acquisition via improper means, it can also be based on disclosure without express or implied consent. It is not the mere fact that defendants possessed the information, but what defendants did with the information, that provides the basis for misappropriation.

## 2. Investment client list

With regard to the investment client list, defendants argue that IFA had a "fiduciary obligation to reassign [the clients] after its relationship ended." Defs.' Mem. in Supp. of Mot. for Summ. J. at 12. Stevens's only response to defendants' argument is that "[d]efendants could continue as fiduciary to the 226 individuals that had IFA products and not restrict Leland Stevens's access to the database . . . ." Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. at 10. Although Stevens objects to defendants'

blocking of his access to the database, he effectively concedes that IFA was required to reassign the investment clients. It is undisputed that Stevens was not an RIA and, absent affiliation with an RIA, was prohibited from providing investment advice. *See* 15 U.S.C. § 80b-3. Upon Stevens's termination, then, he was prohibited from servicing the investment client accounts. In this situation, IFA had little choice but to reassign the investment accounts that had been entrusted to its care.[12] To do otherwise could violated IFA's fiduciary obligations to these clients. *See Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 955 (7th Cir. 2004); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) ("The Investment Advisers Act of 1940 [ ] reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship . . . ."). At the very least, it is not misappropriation. Defendants are therefore entitled to summary judgment on Stevens's ITSA claim regarding the investment clients.

## C.    Damages

Defendants argue that Stevens "incurred no damages" from the disclosure or denial of access to his client lists because he "still has all the information [in hard copy] and because [d]efendants did nothing damaging with the information." Defs.' Mem. in Supp. of Summ. J. at 12-13.[13] Stevens's damages, however, stem from (perhaps among other things) the fact that the disclosure undermined the secrecy of his client list. It is undisputed that defendants disclosed Stevens's Redtail database to Robert

---

[12] The contract between IFA and its clients states that the investment portfolio is "placed under supervision of IFA." Defs.' LR 56.1(a) Stmt., Ex. E (Client Contract), at 1.

[13] Defendants also argue that Stevens did not incur damages because he was prohibited from selling nonpublic information about the investment clients. Defs.' Mem. in Supp. of Summ. J. at 12. Because the Court has already granted summary judgment on the investment client claim, however, the Court need not address this argument.

Gardner, another independent adviser representative. During his deposition, Gardner

testified that he sold insurance products to clients "where Leland Stevens was formerly

the insurance agent of record." Defs.' LR 56.1(a) Stmt., Ex. P (Gardner Dep.), at 57:25-

58:4.[14] He also testified that he offered his services as an insurance agent to Stevens's

former clients and "made no distinction of whether they were—had an account with IFA

or not." *Id.* at 75:3-25. A reasonable jury could find that Gardner used Stevens's

Redtail database to acquire these new insurance clients. Moreover, even if Stevens

cannot prove that he was damaged by the disclosure—that is, if he cannot prove that

Gardner acquired his clients—he may still be entitled to a reasonable royalty. *See* 765

ILCS 1065/4 ("If neither damages nor unjust enrichment caused by the misappropriation

are proved by a preponderance of the evidence, the court may award damages caused

by misappropriation measured in terms of a reasonable royalty for a misappropriator's

unauthorized disclosure or use of a trade secret.").

## IV.   Tortious interference claim

Stevens contends that defendants tortiously interfered with his business

expectancy. Defendants have moved for summary judgment on this claim. To survive

summary judgment, Stevens must point to evidence tending to show (1) a reasonable

expectancy of entering into a valid business relationship, (2) defendants' knowledge of

the expectancy, (3) an intentional and unjustified interference—such as undue

influence, fraud, or duress—by defendants that induced or caused a breach or

termination of the expectancy, and (4) damage to Stevens resulting from defendants'

---

[14] There is some contradictory evidence on this point; it is unclear whether Gardner
actually used the client list to acquire Stevens's insurance clients. That, however, is a
question for the jury to decide.

interference.  *DeHart v. DeHart*, 2013 IL 114137, ¶ 38, 986 N.E.2d 85, 97 (2013); *see also Fidelity Nat. Title Ins. Co. v. Westhaven Props. P'ship*, 386 Ill. App. 3d 201, 219, 898 N.E.2d 1051, 1067 (2007) ("[I]t is insufficient for plaintiff to merely show that defendant interfered with a business expectancy.  Instead, plaintiff must show 'purposeful' or 'intentional' interference, which refers to some impropriety committed by the defendant in interfering with plaintiff's business expectancy.").

Defendants argue that there is no evidence that IFA used Stevens's client information to solicit clients to terminate or reduce their existing business relationships with Stevens or prevented Stevens from selling his business book to another representative.  They also allege that IFA was legally obligated to block Stevens's access to the Redtail database under Regulation S-P.  Accordingly, they contend, blocking Stevens's access to the database was not a tort.  Stevens's sole argument in response is that he "does not agree" with defendants' interpretation of Regulation S-P, "so this is a clearly disputed fact."  Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. at 14. As discussed above, the Court rules that Regulation S-P precluded defendants from disclosing investment client information to Stevens.  Beyond terminating Stevens's access to the database, there is no evidence in the record that defendants intentionally and unjustifiably interfered with his business relationships.[15]  Accordingly, Court grants summary judgment for defendants on this claim.

---

[15] In responding to an earlier motion to dismiss this claim, Stevens contended that defendants prevented him from selling his book of business to Gardner.  Discovery has not produced any evidence of such interference.  *See* Defs.' LR 56.1(a) Stmt., Ex. P (Gardner Dep.), at 62:16-21 (stating that no one at IFA told him that he could not buy Stevens's business or prevented him from purchasing Stevens's business); *id.* at 46:12-17 (stating that IFA's president told him, "[r]ight now I don't know what he's got to sell," but nothing else).

## V.    Unjust enrichment

Stevens contends that IFA was unjustly enriched by "its unlawful assumption of ownership of the [investment] client accounts by receiving substantial revenue from Leland Steven's [sic] book of business."  Pl.'s Mem. in Supp. of Mot. for Summ. J. at 16.  "IFA has taken these benefits," he adds, "despite plaintiff Leland Steven's [sic] superior right of ownership and transfer rights."  *Id.*  He alleges that "IFA promised [him] that [he] owned his [investment] book of business as his sole separate property including the right to keep it or transfer."  *Id.* at 17.  But because "[t]here is no contract for the sale or transfer of the [investment] client accounts," he argues, there is no possible claim under the "contract or adequate remedy at law."  *Id.* at 16.

Unjust enrichment is an equitable remedy available under Illinois law.  *See Hess v. Kanoski & Assocs.*, 668 F.3d 446, 454 (7th Cir. 2012).  "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989).

Illinois law is arguably somewhat confused on whether a claim of unjust enrichment requires an underlying tort or breach of contract or whether, instead, there can be a free-standing claim based on the proposition that it would be unjust for the defendant to retain a benefit that it obtained at the plaintiff's expense.  In *Cleary v. Philip Morris Inc.*, 656 F.3d 311 (7th Cir. 2011), the Seventh Circuit said that "it appears that the Illinois Supreme Court recognizes unjust enrichment as an independent cause of

action," in other words a claim that can be asserted without an underlying "'claim grounded in tort, contract, or statute.'" *Id.* at 516 (quoting *Raintree Homes, Inc. v. Vill. of Long Grove*, 209 Ill. 2d 248, 258, 807 N.E.2d 439, 445 (2004)). The court also noted, however, that some recent Illinois Appellate Court cases seem to say the opposite. *Id.* at 516-17 & n.2. The Illinois Supreme Court's pronouncements, of course, trump those of lower Illinois courts. This Court therefore understands Illinois law *not* to require an underlying claim for breach of contract or tort. Rather, "[t]he theory of unjust enrichment is based on a contract implied in law." *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 607 N.E.2d 165 (1992). In other words, unjust enrichment is a theory of liability under which the law imposes an obligation upon the defendant to repay a benefit that it obtained at the plaintiff's expense, even in situations where the defendant does not owe a contractual duty to repay and has not committed an independent tort directed at the plaintiff. *See generally Macon Cnty. v. MERSCORP, Inc.*, 742 F.3d 711, 714 (7th Cir. 2013) ("The two theories of unjust enrichment—the one requiring an unlawful act, the other requiring only a finding of 'injustice'—merge in cases which say that unjust enrichment is a remedy for a breach of a contract implied in law.").

That said, and as the Seventh Circuit noted in *Cleary*, unjust enrichment claims often *are* based on an underlying claim of improper conduct by the defendant, "[a]nd usually this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute." *Cleary*, 656 F.3d at 517 (footnote omitted). "[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Id.*

Stevens's summary judgment filings are less than a model of clarity regarding the basis for his unjust enrichment claim.  But one way or another, the outcome is clear.  First, to the extent Stevens claims unjust enrichment in the remedial sense—i.e., a way to recover not the damages he sustained but rather the profit defendants obtained from their wrongful acts, *see MERSCORP*, 742 F.3d at 714—then his claim stands only to the extent his underlying tort and contract claims stand.

Second, to the extent Stevens claims unjust enrichment in its more substantive sense, *see id.*, he seems to be saying that the law should impose an obligation upon the defendants to pay him the profits they earned from his entire book of business.  He cannot successfully maintain an unjust enrichment claim on this basis.  The reason is that "[u]nder Illinois law, a plaintiff may not state a claim for unjust enrichment when a contract governs the relationship between the parties."  *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014).  Though, as Stevens points out, his contract with IFA does not address ownership of the advisory clients following termination, "[i]n determining whether a claim falls outside a contract, the subject matter of the contract governs, not whether the contract contains terms or provisions related to the claim."  *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 689 (7th Cir. 2004); *see also Borowski v. DePuy, a Div. of Boehringer Mannheim Co.*, 850 F.2d 297, 301 (7th Cir. 1988) (noting that regardless of whether "[t]he failure to provide for other terms" is "intentional" or "due to oversight . . . [a]n action sounding in quasi-contract will not lie").  So long as "a contract exists between the parties concerning the *same subject matter* on which the quasi-contractual claim rests," the existence of a contract bars a claim for unjust enrichment.  *Indus. Lift Truck Serv. Corp. v. Mitsubishi Int'l Corp.*, 104

Ill. App. 3d 357, 360, 432 N.E.2d 999, 1002 (1982) (emphasis added).

Illinois courts have read the phrase "same subject matter" broadly.  In *Industrial Lift*, for instance, the contract did not expressly cover the precise subject raised by the plaintiff—the fact that the plaintiff had performed a specific service for the defendant without being paid.  *Id.* at 361, 432 N.E.2d at 1002.  However, the subject matter of compensation, as well as "the sale and servicing of defendant's products," was covered by the contract.  *Id.* at 361-62, 432 N.E.2d at 1002-03.  The court emphasized, furthermore, that the contract included an integration clause wherein "the contract was declared to be the entire agreement of the parties and could only be amended by express agreement of the parties."  *Id.* at 361, 432 N.E.2d at 1002.  Thus, even though the contract did not "cover the specific service plaintiff rendered," the court held that the defendant "had a right to assume, absent a valid amendment to the agreement, that it should not have to compensate plaintiff for any acts done in relation to the subject matter of the contract except pursuant to the contract terms."  *Id.* at 362, 432 N.E.3d at 1003.

As in *Industrial Lift*, the contract between Stevens and IFA does not deal with the specific subject at issue in this case:  ownership of the client accounts upon termination of the agreement.  However, it does cover the same subject matters, including fees and supplemental compensation; termination of the agreement; the independent adviser representative's relationship to the clients while the agreement is in force; and buyout of client accounts upon retirement.  Defs.' LR 56.1(a) Stmt., Ex. H (Stevens-IFA Contract).  Moreover, the promise was allegedly made during a meeting in which Stevens and IFA's president reviewed and signed his written contract.  *See* Defs.' LR 56.1(a) Stmt.,

Ex. D (Stevens Dep.), at 154:12-20 (testifying that he "wanted to verify" that "the clients belong to me" because "[i]t addresses it in the contract" and that language might suggest otherwise).  And, like the contract in *Industrial Lift*, the contract between IFA and Stevens has an integration clause that states, "This Agreement contains the entire understanding between and among the parties and supersedes any prior understandings and agreements among them respecting the subject matter of this Agreement.  This Agreement may be amended or modified only by a written instrument signed by both parties."  *Id.* at 12.  Thus it is clear that the apparent basis for Stevens's unjust enrichment claim—his purported ownership of the clients upon termination—is related to the subject matter covered in the contract.  The existence of the contract precludes Stevens from pursuing an unjust enrichment claim on this basis.

## VI.     Affirmative defense:  failure to mitigate damages

As an affirmative defense, defendants contend that Stevens failed to mitigate damages.  "It has long been the law in Illinois that an injured party has an obligation to take reasonable steps to minimize his damages and thus avoid heaping up additional losses for which the tortfeasor may be held liable."  *Toledo Peoria & W. Ry. v. Metro Waste Sys., Inc.*, 59 F.3d 637, 640 (7th Cir. 1995) (citing *Culligan Rock River Water Conditioning Co. v. Gearhart*, 111 Ill. App. 3d 254, 258, 443 N.E.2d 1065, 1068 (1982)).  If the injured party "fails to take reasonable steps to avoid additional harm, he bears the risk of any increased damages which could have been avoided."  *Allied Tube & Conduit Corp. v. S. Pac. Transp. Co.*, 211 F.3d 367, 372 (7th Cir. 2000).  To prevail on summary judgment, defendants must show that no reasonable jury could find that Stevens mitigation efforts were reasonable.

Stevens concedes that the only person to whom he attempted to sell his business book was Robert Gardner.  Defs.' LR 56.1(a) Stmt., Ex. D (Stevens Dep.), at 171:5-20.  He also admits that his thinking during this period "might not have been the most rational."  *Id.* at 171:13-16.  At the same time, Stevens says that he genuinely believed that any attempt to sell his business book would have been futile.  *Id.* at 171:18-20.  Indeed, IFA had sent letters to his clients stating that the clients had been reassigned to Gardner.  *Id.* at 172:7-14.  This called ownership of the IFA clients into question and, Stevens believed, made sale of the business book impossible (that is, buyers would not want to purchase a business book with competing claims to ownership).  *Id.*  He also contends that he reasonably believed—and still believes—that he could not have associated with a new RIA because he was under FINRA investigation.  *Id.* at 227:17-228:5.  Additionally, Stevens did mitigate his damages to an extent:  he continued to service his insurance clients and convinced certain of his investment clients to switch to insurance products.  Based on these facts, a reasonable jury could find that that Stevens's mitigation efforts were reasonable under the circumstances.

## VII.    Redtail's liability

It is undisputed that IFA directed Redtail to block Stevens's access to the Redtail database and grant access to other independent adviser representatives.  An agent-principal relationship was therefore created.  *See Toney v. Quality Res., Inc.*, No. 13 C 42, 2014 WL 6757978, at *10 (N.D. Ill. Dec. 1, 2014) (observing that an agency relationship "arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's

control, and the agent manifests assent or otherwise consents so to act"); *see also* Restatement (Third) of Agency § 1.01 (2006). Though an agent, Redtail is jointly and severally liable with IFA for any tort committed against Stevens. *See Fortech, L.L.C. v. R.W. Dunteman Co.*, 366 Ill. App. 3d 804, 809-10, 852 N.E.2d 451, 456 (2006) ("[I]t is a well-settled general proposition that principals and agents are jointly and severally liable for tortious conduct."); Restatement (Third) Of Agency § 7.01 (2006) ("An agent whose conduct is tortious is subject to liability. This is so whether or not the agent acted with actual authority, with apparent authority, or within the scope of employment."). Indeed, with regard to conversion specifically, Illinois courts have held: "An agent who wrongfully converts another's property, or who assists his principal in so doing, is personally liable for the conversion. This is true even if the agent commits the act in good faith, and without knowledge of the owner's rights, and in obedience to his principal's commands. The agent need gain nothing from the transaction." *Fortech*, 366 Ill. App. 3d at 811-12, 852 N.E.2d at 458.

Defendants argue that "[t]here is no evidence that Redtail had any obligation to Stevens" because the contract was between Redtail and IFA, not Redtail and Stevens. Accordingly, defendants argue, "Redtail has no place in this case" and should be dismissed as a defendant. But Stevens's conversion and ITSA claims sound in tort, not contract. Even without a contract, Redtail was bound by "the common-law obligation that every person must so act or use that which he controls as not to injure another." *Fortech*, 366 Ill. App. 3d at 810, 852 N.E.2d at 457. Moreover, as discussed above, Stevens has raised a genuine dispute as to the existence and terms of his agreement with Redtail. Thus, a reasonable jury could find that Redtail owed a duty to Stevens.

**Conclusion**

For the foregoing reasons, the Court partly grants and partly denies defendants' motion for summary judgment [dkt. no. 142]. First, on the conversion claim, defendants are entitled to summary judgment with regard to the investment client accounts and investment client information claims but not with regard to the insurance client information claim. Second, on the trade secret misappropriation claim, the Court grants summary judgment for defendants on the investment client information claim but denies summary judgment on the insurance client information claim. Third, the Court grants summary judgment for defendants on Stevens's tortious interference with business expectancy claim. Fourth, on Stevens's unjust enrichment claim, the Court grants summary judgment for defendants except to the extent it tracks his remaining underlying claims. Fifth, the Court denies plaintiff's motion for summary judgment [dkt. no. 146]. Finally, the Court denies defendants' motion to strike plaintiffs' expert disclosures [dkt. no. 129] without prejudice to renewal as a motion in limine. The case is set for a telephone status hearing on March 3, 2015 at 9:00 a.m. for the purpose of setting dates for the final pretrial order and final pretrial conference and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 24, 2015